STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Michael James CARTER,
Defendant-Appellant.

Supreme Court

*No. 2008AP1185–CR. Oral argument November 3, 2009.
—Decided May 25, 2010.*

2010 WI 40

(Also reported in 782 N.W.2d 695.)

640

643

For the plaintiff-respondent-petitioner the cause was argued by *Aaron R. O'Neil,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-appellant there was a brief by *John T. Wasielewski* and *Wasielewski & Erickson,* Milwaukee, and oral argument by *John T. Wasielewski.*

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished court of appeals' decision[1]

---

[1] *State v. Carter,* No. 2008AP1185–CR, unpublished order (Wis. Ct. App. Mar. 12, 2009).

that reversed the Milwaukee County Circuit Court, Judge Patricia D. McMahon presiding, and remanded for further proceedings. On January 27, 2006, Michael J. Carter (Carter) was convicted of one count of first-degree sexual assault of a child under Wis. Stat. § 948.02(1) (2005–06).[2] Judge Mel Flanagan sentenced Carter to 27 years imprisonment, comprised of 12 years in initial confinement and 15 years on extended supervision. On January 25, 2008, Carter filed a post-conviction motion for a new trial on the grounds of ineffective assistance of counsel. Specifically, Carter argued that his trial counsel was ineffective because he failed to introduce evidence that the five-year-old victim was previously sexually assaulted, which would have provided an alternative explanation for her detailed sexual knowledge. On April 17, 2008, Judge McMahon conducted a *Machner* hearing[3] and denied the motion. Carter appealed, and the court of appeals remanded the matter to the circuit court for further proceedings. The State petitioned this court for review, and we accepted. We now reverse the decision of the court of appeals.

¶ 2. The issue before us is whether the court of appeals properly remanded the case to the circuit court

[2] Wisconsin Stat. § 948.02(1)(2005–06) provides in relevant part: "Whoever has sexual contact or sexual intercourse with a person who has not attained the age of 13 years is guilty of one of the following: . . . (b) If the sexual contact or sexual intercourse did not result in great bodily harm to the person, a Class B felony."

[3] "Under *State v. Machner,* 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979), a hearing may be held when a criminal defendant's trial counsel is challenged for allegedly providing ineffective assistance. At the hearing, trial counsel testifies as to his or her reasoning on challenged action or inaction." *State v. Thiel,* 2003 WI 111, ¶ 2 n.3, 264 Wis. 2d 571, 665 N.W.2d 305.

for further proceedings on Carter's claim that his trial counsel was ineffective.

¶ 3. We conclude that the court of appeals improperly remanded the case to the circuit court for further proceedings. Carter's ineffective assistance of counsel claim fails under the two-part inquiry of *Strickland v. Washington,* 466 U.S. 668, 687 (1984). First, his trial counsel's performance was not deficient. His counsel's strategic decision not to introduce evidence that the child victim was previously sexually assaulted was objectively reasonable considering all the circumstances. Second, even assuming that his counsel's performance was deficient, the deficiency did not prejudice Carter's defense. Evidence that the child victim was previously sexually assaulted would have been inadmissible under Wisconsin's rape shield law, Wis. Stat. § 972.11(2) (2007–08),[4] and the narrow five-part test articulated in *State v. Pulizzano,* 155 Wis. 2d 633, 656–57, 456 N.W.2d 325 (1990). Accordingly, this court reverses the court of appeals' decision and upholds the judgment of the circuit court denying Carter's postconviction motion for a new trial.

## I. FACTS

¶ 4. On August 25, 2005, Carter was charged with one count of first-degree sexual assault of a child. The State alleged that on or between March 1, 2005, and July 31, 2005, Carter forced five-year-old Cassandra L. (Cassandra) to perform oral sex on him. The assault occurred while Carter was living with Cassandra and her mother, Denise. About two weeks after Denise and Cassandra moved to another residence, Cassandra in-

---

[4] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

formed Denise that Carter "touched her down in her private area and wanted her to lick his private area." Denise took Cassandra to urgent care, and they eventually spoke to police.

¶ 5. Cassandra spoke with city of Milwaukee police officer Lucretia Thomas (Officer Thomas). According to Cassandra, one night while her mother was sleeping, she was watching television with Carter when he asked her to "come by him." Carter unbuttoned his shorts and pulled them down a short distance. Cassandra described seeing "a thing sticking out like my kitty." To demonstrate for Officer Thomas, she placed her stuffed pink cat at her vaginal area and angled it upward. Cassandra also described seeing hair the same color as her mother's (brunette). According to Officer Thomas, Cassandra indicated "that she knew what [Carter] wanted her to do" because Cassandra said that she "closed her mouth tight" when he told her to come by him. Carter then pried open Cassandra's mouth and pushed her head down onto his "private part," using his hand to push her head up and down. When he stopped, Cassandra described wiping her mouth and seeing "white stuff hanging from her hand." Cassandra stated that after she washed her hands in the bathroom, she passed Carter in the hallway, and he pretended to zip his mouth and turn a key.

¶ 6. At trial, before any witness was called, Carter's trial counsel, Stephen Sargent (Sargent), informed the circuit court that he would not be presenting any evidence that Cassandra may have been previously sexually assaulted by a third party. As a "strategic decision," he opted not to present the evidence because he thought (1) the prosecutor would object; (2) the evidence was not relevant; and (3) the evidence would build the jury's sympathy for Cassandra.

¶ 7. The jury convicted Carter of one count of first-degree sexual assault of a child. After he was sentenced, Carter retained new counsel and filed a post-conviction motion for a new trial, claiming that Sargent provided ineffective assistance of counsel. Carter argued that Sargent was ineffective because he failed to introduce evidence that Cassandra was previously sexually assaulted, which would have provided an alternative explanation for her detailed sexual knowledge.

¶ 8. At the *Machner* hearing, Carter testified that Cassandra was previously sexually assaulted by her cousin, and it was from that assault that Cassandra derived her detailed sexual knowledge. Carter learned of the alleged sexual assault in the summer of 2004 while he, Denise, and Cassandra were at Carter's grandmother's house. According to Carter, he was in the bathroom when Cassandra stood outside the door and asked Carter if he "wanted her to make juice." Carter came out of the bathroom and told Cassandra that they did not have any juice, to which Cassandra replied that she "can help [Carter] make juice" and pointed towards his crotch. When asked what she meant, Cassandra said, "Like [her cousin]." Carter gathered from Cassandra's explanation that "her and [her cousin] were upstairs in her bedroom, and she basically pulled on his penis to get him to ejaculate."

¶ 9. Carter then testified that on the same day, he relayed the incident to Denise. He testified that when questioned by Denise, Cassandra described playing upstairs with her cousin when he pulled his pants down and told her to pull "on his thing." Carter testified that Cassandra then told Denise that "some stuff came out," and the color was white.

¶ 10. According to Carter's testimony at the hearing, sometime later Denise told him specifically that a social worker and sheriff came over to the house and spoke to Cassandra alone.[5]

¶ 11. Carter alleged that Cassandra referenced the previous sexual assault in a videotaped interview with city of Milwaukee police officer Christine Koch taken on August 26, 2005, shortly after Carter was charged with sexually assaulting Cassandra.[6] In his post-conviction motion, Carter summarized the relevant portion of the videotape as follows:

> In this interview, after telling of events involving Mr. Carter, Officer Koch asked Cassandra if she had seen anyone else's private part. (This starts at about 10:14 a.m. on the clock superimposed on the video.) Cassandra related that she saw [her cousin's] private part. [Her cousin] . . . is older than Cassandra and is like a grown-up. This happened when Cassandra was four years old. This happened in a big place where they went upstairs. [Her cousin] was "making juice." His pants were down.

The State, however, maintained that Cassandra made no such reference:

> What we have is a statement by a girl in a videotape that says she saw her cousin's penis and that is all we have in that videotape.

---

[5] However, as the circuit court pointed out, Carter's post-conviction motion made no mention of the alleged previous sexual assault ever being reported to the police.

[6] This videotape was not presented at trial, and neither Carter nor the State introduced the videotape at the post-conviction hearing. Accordingly, the videotaped interview did not appear in the record before this court, and we must rely on the parties' interpretations of the interview.

652

She doesn't talk about anything else. She doesn't describe it. She doesn't say anything. All she says she sees her cousin's penis. She doesn't even know whether he's a boy or an adult.

Then there is some incident of playing and some making of drinks and things like that; but there is nothing that says that she touched him, that he touched her, that there was anything that was sexual in nature.

¶ 12. In either case, Carter's trial counsel, Sargent, viewed the videotaped interview and opted not to present evidence at trial of the alleged previous sexual assault. At the *Machner* hearing, Sargent recalled that Carter mentioned to him that another person may have "molested" Cassandra, but Carter was not any more specific. After hearing the information, Sargent arranged for an investigator to contact Cassandra through Denise, but Denise declined to speak to the investigator.

¶ 13. According to Sargent,[7] presenting evidence of the previous sexual assault would have been an unwise defense strategy:

[A]s far as who may have sexually assaulted this girl, or when, or where, I did have my investigator attempt to contact the mother of the child. That was not going anywhere, and I made the strategic move we should challenge the mother's credibility through the child rather than other defenses.

¶ 14. Instead of directly attacking Cassandra, Sargent opted instead to challenge her credibility through Denise, by demonstrating that there was a

---

[7] By the time of the *Machner* hearing on April 17, 2008, Sargent had been employed for 18 years as a staff attorney in the State Public Defender's Office, Milwaukee Trial Division.

653

breakdown in Denise and Carter's relationship, and Denise pressured Cassandra into making the allegations against Carter. In Sargent's view, the videotaped interview depicted a "very sympathetic child," and he did "not wish to build up sympathy for the Jury towards this child and then have to challenge this child's credibility and the mother's credibility within the same trial."

¶ 15. In deciding not to present evidence of the previous sexual assault, Sargent conceded that he never researched whether the evidence would have been admissible. Specifically, Sargent did not review *State v. Pulizzano,* a decision by this court that created a narrow exception to the general inadmissibility of a victim's sexual history. *See* 155 Wis. 2d 633. Pursuant to *Pulizzano,* evidence of a prior sexual assault against a child victim is admissible if the defendant satisfies a five-part test, and the court determines that the defendant's right to present the evidence outweighs the State's interest in excluding it. *Id.* at 656–57. Concerning his familiarity with *Pulizzano,* Sargent provided the following testimony at the post-conviction hearing:

> Q: [Attorney Wasielewski, on behalf of Carter]: Now when you considered whether or not to bring up this prior sexual assault of Cassandra, what was your understanding as to whether it was legally admissible?

> A: [Attorney Sargent]: I would have to say I did not look too far whether it was admissible. It was my understanding at some point it may or may not have been.

> Q: Did you ever review a case called *State v. Pulizzano?*

A: No, I did not.

Q: Or any subsequent case that quotes the *Pulizzano* test?

A: Prior to trial, no, I did not.

Q: Did you do any research that led you to any conclusion as to the admissibility of the prior incident?

A: I did not go into researching of that issue.

Q: So you made a strategic decision not to go after it without pursuing the question whether you could pursue the admission of the prior incident; is that a fair statement?

A: No. To be accurate to say I did not believe that issue to be a strong one as strategic—as a trial defense strategy that I—that as far as who may have sexually assaulted this girl, or when, or where, I did have my investigator attempt to contact the mother of the child. That was not going anywhere, and I made the strategic move we should challenge the mother's credibility through the child rather than other defenses.

¶ 16. At the close of the *Machner* hearing, the circuit court denied Carter's motion for a new trial, concluding that Carter did not receive ineffective assistance of counsel. First, the circuit court determined that Sargent's decision not to present evidence of the previous sexual assault was a reasonable one. The circuit court declined to criticize Sargent for opting not to present evidence that he deemed irrelevant to his defense strategy and that would have conjured up sympathy for the child victim. Second, Carter failed to establish that his defense was prejudiced by Sargent's decision not to present evidence of the previous sexual

assault. According to the circuit court, the admissibility of the evidence presented a "very uphill battle" under *Pulizzano*. The circuit court also found that Carter's testimony was not credible, especially concerning his statement that the alleged previous sexual assault had been reported to the police.

¶ 17. The court of appeals remanded the case to the circuit court for further proceedings. The court of appeals concluded that Sargent's performance was deficient given his failure to investigate whether the previous sexual assault had occurred and his unfamiliarity with *Pulizzano*. However, the court of appeals stated that until further investigation was completed, neither the court of appeals nor the circuit court could determine whether Carter was prejudiced by Sargent's deficient performance. Accordingly, the court of appeals did not grant Carter a new trial and instead remanded the case to the circuit court for further proceedings.[8]

¶ 18. On review, we conclude that Carter did not receive ineffective assistance of counsel. We therefore reverse the decision of the court of appeals and uphold the judgment of the circuit court denying Carter's post-conviction motion for a new trial.

[8] The State argues for the first time in its reply brief that since the court of appeals did not grant Carter's request for a new trial and instead remanded for further proceedings, Carter cannot request this court to grant him a new trial because he failed to file a petition for cross-review. *See* Wis. Stat. § 809.62(3m)(a) ("A party who seeks to reverse, vacate, or modify an adverse decision of the court of appeals shall file a petition for cross-review within the period for filing a petition for review with the supreme court, or 30 days after the filing of a petition for review by another party, whichever is later."); Wis. Stat. § 809.62(1g)(b) (defining "adverse decision" to include the court of appeals' failure to grant the full relief sought). Because of our decision to reverse the court of appeals, it is unnecessary for us to address this issue.

## II. STANDARD OF REVIEW

¶ 19. A claim of ineffective assistance of counsel is a mixed question of fact and law. *State v. Thiel,* 2003 WI 111, ¶ 21, 264 Wis. 2d 571, 665 N.W.2d 305; *State v. Erickson,* 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Thiel,* 264 Wis 2d 571, ¶ 21. "Findings of fact include 'the circumstances of the case and the counsel's conduct and strategy.' " *Id.* (quoting *State v. Knight,* 168 Wis. 2d 509, 514 n.2, 484 N.W.2d 540 (1992)). Moreover, this court will not exclude the circuit court's articulated assessments of credibility and demeanor, unless they are clearly erroneous. *Thiel,* 264 Wis. 2d 571, ¶ 23. However, the ultimate determination of whether counsel's assistance was ineffective is a question of law, which we review de novo. *Id.,* ¶ 21.

## III. ANALYSIS

¶ 20. Both the United States Constitution and the Wisconsin Constitution guarantee criminal defendants the right to counsel. U.S. Const. amend. VI; Wis. Const. art. I, § 7.[9] The United States Supreme Court has recognized that " 'the right to counsel is the right to the

_____

[9] The Sixth Amendment of the U.S. Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

effective assistance of counsel.' " *Strickland,* 466 U.S. at 686 (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970)).[10]

¶ 21. Whether a convicted defendant received ineffective assistance of counsel is a two-part inquiry. *Strickland,* 466 U.S. at 687. First, the defendant must prove that counsel's performance was deficient. *Id.* Second, if counsel's performance was deficient, the defendant must prove that the deficiency prejudiced the defense. *Id* In order for Carter to succeed on his claim of ineffective assistance of counsel, he must satisfy both prongs of the *Strickland* test. *See id.* This court concludes that he has satisfied neither.

## A. Deficient Performance

¶ 22. To demonstrate deficient performance, the defendant must show that his counsel's representation "fell below an objective standard of reasonableness"

Similarly, the Wisconsin Constitution, Article I, Section 7 guarantees:

> In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

[10] "The standard for determining whether counsel's assistance is effective under the Wisconsin Constitution is identical to that under the federal Constitution." *Thiel,* 264 Wis. 2d 571, ¶ 18 n.7.

considering all the circumstances. *Id.* at 688. In evaluating the reasonableness of counsel's performance, this court must be "highly deferential." *Id.* at 689. We must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Counsel enjoys a "strong presumption" that his conduct "falls within the wide range of reasonable professional assistance." *Id.* Indeed, counsel's performance need not be perfect, nor even very good, to be constitutionally adequate. *Thiel,* 264 Wis. 2d 571, ¶ 19 (citing *State v. Williquette,* 180 Wis. 2d 589, 605, 510 N.W.2d 708 (1993)).

¶ 23. Strategic decisions made after less than complete investigation of law and facts may still be adjudged reasonable. *Strickland,* 466 U.S. at 690–91. "[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691 (emphasis added). In evaluating counsel's decision not to investigate, this court must assess the decision's reasonableness in light of "all the circumstances," "applying a heavy measure of deference to counsel's judgments." *Id.*

¶ 24. We conclude that Sargent's performance was not deficient because his strategic decision not to present evidence of the previous sexual assault was objectively reasonable considering all the circumstances.[11] At trial, Sargent informed the circuit court that he had made the strategic decision not to present

---

[11] In his brief, Carter appears to argue that the deficiency of Sargent's performance is not at issue because the State, in its brief, "acknowledge[d], though not wholeheartedly, that . . .

evidence that Cassandra may have been previously sexually assaulted by a third party. He gave three reasons for his decision: (1) "[he] thought the DA would likely object"; (2) "[he did not] see it as relevant"; and (3) "[he thought he would]—if anything, build up sympathy for this young girl." Like the circuit court, we decline to criticize Sargent for opting not to present evidence that he deemed irrelevant to his defense strategy and that would have conjured up the jury's sympathy for Cassandra.

¶ 25. At the *Machner* hearing, Sargent clearly articulated the defense strategy he chose: instead of directly attacking Cassandra, he opted instead to challenge her credibility through Denise, by demonstrating that there was a breakdown in Denise and Carter's relationship, and Denise used Cassandra as a tool in that breakup. Sargent's chosen defense strategy was revealed at trial through his opening argument; his cross-examination of Denise and Cassandra; his direct-examination of Carter; and the State's closing argument.

¶ 26. In his opening argument, Sargent represented to the jury that Denise and Carter had an angry relationship, for which Denise and Cassandra harbored hostility towards Carter:

> Look at the case. Look at all the witnesses. Look at their testimony. Look at the—the nature of this girl, relationship with her mother, their relationship with Mr. Carter.

'perhaps Sargent's decision not to pursue the [alleged previous sexual assault] matter further was not reasonable.' " We decline to dispose of the deficient performance prong on that basis. As discussed *supra* Part II, the determination of whether counsel performed deficiently is a question of law that this court reviews independently. *Thiel,* 264 Wis. 2d 571, ¶ 21.

Now, I think one fallacy in life is that we think that we have to show that kids are manipulative or they think that—you know, they create grand schemes.

It's not one of those cases.

Question of whether or not the atmosphere of this child that was living at—was such that there was a great deal of hostility towards Michael Carter.

There will be. There will be some things you hear about the relationship of Michael Carter and her mother that were bad.

There will be some things you hear about Michael Carter that are not good to hear, that he was involved in some very bad arguments with his girlfriend. There was arguments over money. There was arguments over drugs. Okay.

That is not very good to talk about, that's not very positive, but that's the facts that this child was living in.

There will be testimony about the hostility that this girl saw . . . .

. . . .

. . . In the end I'm gonna ask you to return a not guilty verdict, 'cuz the evidence will show that there really is—there, really, is no clear evidence that Michael Carter did anything improper towards this girl.

He was a man, he was in a relationship, an adult relationship with a woman, the woman had a child, the—

The adult relationship was a volatile one possibly at times, it was [an] angry relationship, it was not a good relationship.

¶ 27. Denise and Carter's broken relationship was further revealed through Sargent's cross-examination of Denise:

■

Q: . . . Towards the spring, into the early summer of 2005, you and Mr. Carter began to have arguments, correct?

A: Yes, sir.

Q: Some of these arguments were—in the—when Cassandra was home?

A: Yes.

Q: Some of these arguments were very loud?

A: Oh, yes.

Q: About money?

A: Yes.

Q: About drug use?

A: Yes.

Q: Michael Carter's drug use?

A: Yes.

Q: They were about a—Michael Carter and a breakup of a relationship, correct?

A: Pardon?

. . . .

Q: Your relationship with Michael Carter was breaking up, correct?

A: Yes.

Q: There's a lot of animosity in that, correct?

A: Correct.

Q: And your daughter had to see a lot of that.

A: Right.

662

¶ 28. During Sargent's cross-examination of Cassandra, Cassandra testified that the arguments between her mother and Carter caused Cassandra to "want[] to get away from" Carter:

Q: And they argued sometimes in front of you.

A: Yes.

Q: And that made you very sad, didn't it?

A: Mm-hmm.

Q: And you wanted to get away from that house, didn't you? And you wanted to get away from Mike, didn't you?

A: Yes.

¶ 29. Sargent's direct-examination of Carter confirmed Denise and Carter's broken relationship:

Q: Now, and in March till August 2005, would—towards the latter part, would you say that you and her mother were having—

. . . Break-up issues, I call it.

You were having disagreements, right?

A: Yes.

Q: You were arguing about money?

A: Quite a bit.

Q: And brought up by her mother, that you were arguing about her drug use?

A: Yes. Along with alcohol abuse.

Q: Okay. And you and her mother were—having some pretty loud arguments—

663

A: Yes—

Q: —in front—

A: —we were—

Q: —of the child.

During that time—were your—Was your alcohol and drug use affecting the relationship?

A: Yes. Quite a bit.

Q: Was that causing a strain on your relationship?

A: Yes.

¶ 30. Finally, Sargent's chosen defense strategy was made clear when it was attacked by the State in its closing argument:

And the last thing I want to talk to you about is, again, [Cassandra's] testimony.

If there was a reason to get Mr. Carter in trouble that was contrived between the mother and this little girl, would it not have been simpler?

Would it have not just been, he hit me. He hit me in my face. Something a little girl would remember.

But a sexual assault, and a sexual assault with this much detail and graphic detail?

Ask yourself, would a six year old be able to carry that off? She's six. Not a sophisticated liar.

¶ 31. Sargent determined that evidence of a previous sexual assault against Cassandra was irrelevant to his defense strategy of challenging Cassandra's credibility through Denise by demonstrating that there was a breakdown in Denise and Carter's relationship, and

Denise used Cassandra as a tool in that breakup. That determination was a reasonable one. Whether Cassandra was previously sexually assaulted by a third party would not have necessarily assisted the trier of fact in assessing whether Denise's broken relationship with Carter caused her to pressure Cassandra into making allegations against Carter. If Denise pressured Cassandra into making up the allegations, the jury could have believed that Denise was the source of Cassandra's sexual knowledge, regardless of the alleged previous sexual assault.

¶ 32. In addition, it was reasonable for Sargent to conclude that if he presented evidence of the previous sexual assault, the jury would have questioned his chosen defense theory. The jury could have found it even less likely that Denise would put her daughter through a lie about sexual assault allegations, given the fact that Cassandra was already a victim. It was a reasonable trial strategy to not risk causing greater sympathy for Cassandra by introducing her as a victim of sexual assault and then directly attacking her credibility. On balance, when evidence of the previous sexual assault is weighed with the strategy employed, and there is already an alternative source of sexual knowledge, that being Cassandra's mother, the fact that Cassandra was previously sexually assaulted militates against the defense. Furthermore, the jury could have concluded that this child was vulnerable to sexual assault by Carter because she was previously a victim. In the end, the jury had to decide who it believed: the child or Carter. Whether the child was a previous victim of sexual assault would not have necessarily assisted the jury in answering that question.[12]

---

[12] In this case, we conclude that evidence of the alleged previous sexual assault would have been inadmissible. *See*

¶ 33. Even more reasonable, however, was Sargent's concern that presenting evidence of the previous sexual assault would have built up the jury's sympathy for Cassandra. The jury would have been faced with the unfortunate prospect that five-year-old Cassandra had been sexually assaulted not once, but twice, and both times by men close to her (her cousin and her mother's live-in boyfriend). Moreover, by attempting to demonstrate that Cassandra gained her detailed sexual knowledge, not from Carter, but from a previous sexual assault by her cousin, Sargent would necessarily have been asking the jury to discredit the testimony of a five-year-old victim of sexual assault. It was certainly reasonable that Sargent was more confident asking the jury to discredit the mother, Denise, instead of directly attacking the child victim.

¶ 34. Finally, Carter urges us to adopt the court of appeals' conclusion that Sargent's performance was deficient because he "ma[d]e a strategic determination without full knowledge of the circumstances of the alleged prior assault and its potential admissibility." *State v. Carter,* No. 2008AP1185–CR, unpublished order (Wis. Ct. App. Mar. 12, 2009). We decline the invitation to override the circuit court's determination regarding the facts, the credibility of the witnesses, and the "very uphill battle" regarding the admissibility of the alleged prior assault under *Pulizzano.* Under the facts of this

*supra* Part III.B. Such evidence, offered as proof of a child victim's "alternative source of sexual knowledge," is not admissible without safeguards. *See State v. Pulizzano,* 155 Wis. 2d 633, 656–57, 456 N.W.2d 325 (1990). We do not accept the proposition that children who are victims of sexual assault should be automatically subject to greater attack than adult victims.

case, counsel's failure to further investigate is not deficient as a matter of law. Strategic decisions made after less than complete investigation of law and facts may still be adjudged reasonable. *Strickland*, 466 U.S. at 690–91. "[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691 (emphasis added). It is our responsibility to determine whether Sargent's decision that further investigation was unnecessary was a reasonable one in light of "all the circumstances," bearing in mind that his judgment is entitled to "a heavy measure of deference." *See id.* at 691. We conclude that Sargent reasonably decided that further investigation of the alleged prior sexual assault and its admissibility was unnecessary. However, to be clear, we do caution that the better practice is for counsel to always research and be familiar with pertinent legal authority. In another case, the failure to do so may constitute deficient performance. Under "all the circumstances" of this case, *id.*, however, we conclude that Sargent's decision not to investigate was reasonable.

¶ 35.　After being informed by Carter that another person may have sexually assaulted Cassandra[13] and

---

[13] There is a discrepancy in the record as to whether Carter was any more specific in describing to Sargent the alleged previous sexual assault.

Sargent testified that at some point before trial (he could not recall when), Carter mentioned to him "that some other possible person" may have previously "molested" Cassandra. However, according to Sargent, Carter never told him about an incident in which Cassandra pointed to Carter's crotch and offered to help him "make juice" and furthermore that Carter never even mentioned Cassandra's cousin:

Q:　[Attorney Wabitsch, on behalf of the State]: So the only thing you knew of any prior incidents that might have been sexual in nature was when Mr. Carter told you

667

after viewing the videotaped interview in which Cassandra told the police that she had seen her cousin's penis, Sargent followed up on the information by arranging for an investigator to contact Cassandra through Denise. Denise, however, would not permit the investigator to speak with Cassandra and never spoke to the investigator herself. Because his investigator's efforts were fruitless and because, in his opinion, the

---

that he believes there was an incident that happened not in Milwaukee and she was molested by another person?

A: [Attorney Sargent]: That would be accurate.

Q: But he didn't tell you what he meant by molesting?

A: He did not have more specific information to my knowledge.

Carter, on the other hand, maintained that he explained to Sargent the specifics about the time in the bathroom when Cassandra asked Carter if he "wanted her to make juice." Carter testified that when he was at the House of Corrections, he told Sargent's assistant, and he was "almost positive that [he] told Steve Sargent, too," that he thinks Cassandra acquired her sexual knowledge from an incident with her cousin. He then testified that he explained to Sargent specifically "everything that Cassie told [him], that there was some type of—something happened between her and her cousin earlier." According to Carter, he consistently took the position with Sargent that evidence of the previous incident between Cassandra and her cousin should be introduced at trial.

The circuit court questioned Carter's credibility, specifically his testimony surrounding the alleged previous sexual assault and whether it had been reported to the police. This court must uphold the circuit court's assessment of Carter's credibility, as it is not clearly erroneous. *See Thiel,* 264 Wis. 2d 571, ¶ 23. As a practical matter, we cannot expect Carter's trial counsel to engage in a full investigation of the alleged previous sexual assault when, according to Sargent, Carter himself offered no specifics on the prior incident between Cassandra and her cousin until he challenged his counsel's effectiveness.

videotaped interview depicted a "very sympathetic child," Sargent decided that further investigation of the alleged previous sexual assault was unnecessary. Instead, he opted to pursue what he considered a wiser defense strategy: attacking Denise's credibility. At that point, it was not necessary for Sargent to research whether evidence of the alleged previous sexual assault was admissible. In light of all the circumstances, we cannot conclude that Sargent made an unreasonable decision when he determined that it was unnecessary to further investigate the alleged previous sexual assault and its admissibility.

¶ 36. Our conclusion that Sargent's performance was not deficient is enough to defeat Carter's ineffective assistance of counsel claim. *See Strickland,* 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.") Nevertheless, we continue our analysis into the second prong of the two-part inquiry and conclude that irrespective of whether Sargent's performance was deficient, Carter's ineffectiveness claim still fails because the deficiency did not prejudice Carter's defense.

## B. Prejudice

¶ 37. To warrant setting aside the defendant's conviction, the defendant must demonstrate that his counsel's deficient performance was prejudicial to his defense. *Id.* at 691–93 (recognizing that "[t]he purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding," and therefore, the defendant must affirmatively prove that

his counsel's deficient performance actually had an adverse effect on the judgment). It is not sufficient for the defendant to show that his counsel's errors "had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 38. Even assuming that Sargent's performance was deficient, we conclude that the deficiency did not prejudice Carter's defense because evidence of the previous sexual assault would have been inadmissible. Thus, regardless of whether Sargent attempted to present evidence of the previous sexual assault, the result of the proceeding would have been the same.

### 1. General Inadmissibility under Wisconsin's Rape Shield Law

¶ 39. Wisconsin's rape shield law, Wis. Stat. § 972.11(2),[14] generally prohibits a defendant like Carter from introducing evidence concerning the al-

---

[14] Wisconsin Stat. § 972.11(2) provides in relevant part:

(a) In this subsection, "sexual conduct" means any conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life-style.

(b) If the defendant is accused of a crime under s. 940.225, 948.02, 948.025, 948.05, 948.051, 948.06, 948.085, or 948.095, or under s. 940.302(2), if the court finds that the crime was sexually motivated, as defined in s. 980.01(5), any evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct shall not be admitted into evidence during the course of

leged victim's prior sexual conduct. Our legislature enacted the rape shield law "to counteract outdated beliefs that a complainant's sexual past could shed light on the truthfulness of the sexual assault allegations." *State v. Dunlap,* 2002 WI 19, ¶ 19, 250 Wis. 2d 466, 640 N.W.2d 112 (citing *Michael R.B. v. State,* 175 Wis. 2d 713, 727, 499 N.W.2d 641 (1993)). The law "protect[s] victims of sexual assault from themselves becoming the focus of scrutiny during trial," *Michael R.B.,* 175 Wis. 2d at 727, as it is generally recognized that evidence of the victim's prior sexual conduct is " 'irrelevant or, if relevant, substantially outweighed by its prejudicial effect,' " *State v. Dodson,* 219 Wis. 2d 65, 70, 580 N.W.2d 181 (1998) (quoting *Pulizzano,* 155 Wis. 2d at 644).

■

¶ 40. Evidence that Cassandra may have had previous sexual contact with her cousin clearly falls under the rape shield law's definition of "sexual conduct." *See* Wis. Stat. § 972.11(2)(a). Accordingly, unless Carter can demonstrate that such evidence is statutorily or judicially excepted from the rape shield law, the evidence is inadmissible.[15]

---

the hearing or trial, nor shall any reference to such conduct be made in the presence of the jury, except the following, subject to s. 971.31(11):

1. Evidence of the complaining witness's past conduct with the defendant.

2. Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.

3. Evidence of prior untruthful allegations of sexual assault made by the complaining witness.

[15] It is evident from Carter's brief that he does not take issue with the fact that evidence that Cassandra may have been

2. Inadmissibility even under *State v. Pulizzano*'s exception to the Rape Shield Law

¶ 41. In *Pulizzano,* this court held that while Wisconsin's rape shield law is constitutional on its face, as applied it may unconstitutionally infringe upon a defendant's rights to confrontation and compulsory process. 155 Wis. 2d at 647–48. " 'In the circumstances of a particular case evidence of a complainant's prior sexual conduct may be so relevant and probative that the defendant's right to present it is constitutionally protected.' " *Dodson,* 219 Wis. 2d at 71 (quoting *Pulizzano,* 155 Wis. 2d at 647). In particular, this court has recognized that when the complainant is a child, the possibility of the child having a previous sexual experience may be relevant to the defendant's case because it could provide an alternative source for the child's detailed sexual knowledge. *Dunlap,* 250 Wis. 2d 466, ¶ 19 (citing *Michael R.B.,* 175 Wis. 2d at 728).

¶ 42. Accordingly, in *Pulizzano,* we articulated a narrow test that the defendant must satisfy in order "to present otherwise excluded evidence of a child complainant's prior sexual conduct for the limited purpose of proving an alternative source for sexual knowledge":

> [P]rior to trial the defendant must make an offer of proof showing: (1) that the prior acts clearly occurred; (2) that the acts closely resembled those of the present case; (3) that the prior act is clearly relevant to a material issue; (4) that the evidence is necessary to the defendant's case; and (5) that the probative value of the evidence outweighs its prejudicial effect. If the defen-

---

previously sexually assaulted by her cousin does not fall under any of the three statutory exceptions to the rape shield law. *See* Wis. Stat. § 972.11(2)(b)(1)—(3).

dant makes that showing, the circuit court must then determine whether the State's interests in excluding the evidence are so compelling that they nonetheless overcome the defendant's right to present it. . . .

*Pulizzano,* 155 Wis. 2d at 656–57.

¶ 43. Despite our acknowledgement that the rape shield law "takes on a slightly different role when the complainant is a child," *Dunlap,* 250 Wis. 2d 466, ¶ 19, this court cautions that the *Pulizzano* exception to the rape shield law is intentionally narrow and must be applied accordingly. Even when the complainant is a child, evidence of his or her previous sexual experience can still be "extremely prejudicial" and can "improperly focus attention on the complainant's character and past actions, rather than on the circumstances of the alleged assault." *Id.* That the complainant happens to be a child, rather than an adult, does not alter the intention behind the rape shield law: "to protect victims of sexual assault from themselves becoming the focus of scrutiny during trial," *Michael R.B.,* 175 Wis. 2d at 727.

¶ 44. In this case, we conclude that Carter's offer of proof fails the first and second prongs of the *Pulizzano* test, and therefore, evidence of the alleged previous sexual assault against Cassandra is not admissible as an exception to the rape shield law.

a. Did the prior sexual assault "clearly occur"?

¶ 45. Carter's offer of proof fails the first prong of the *Pulizzano* test because the alleged previous sexual assault against Cassandra did not "clearly occur[]." *See* 155 Wis. 2d at 656. To demonstrate that the previous assault "clearly occurred," Carter's offer of proof

673

" 'should state an evidentiary hypothesis underpinned by a sufficient statement of facts to warrant the conclusion or inference that the trier of fact is urged to adopt.' " *Id* at 652 (quoting *Milenkovic v. State,* 86 Wis. 2d 272, 284, 272 N.W.2d 320 (Ct. App. 1978)). The facts as presented do not warrant the conclusion that Cassandra was clearly sexually assaulted by her cousin. As for evidence of the sexual assault, we have only Carter's testimony and a videotaped interview with Cassandra in which she told Officer Koch that she had seen her cousin's penis. Neither Carter's testimony nor the videotaped interview sufficiently demonstrates that the previous sexual assault "clearly occurred."

¶ 46. Carter testified that Cassandra pointed to his crotch and offered to "help [him] make juice," explaining to him that she "made juice" with her cousin by pulling on his penis and getting him to ejaculate. Carter offered no corroborating testimony from Cassandra, Denise, or Cassandra's cousin. Furthermore, while he testified that a social worker and sheriff came over to the house and talked to Cassandra about the incident, Carter introduced no documentation to support his assertion that the incident had ever been reported to the police. The circuit court adjudged Carter not credible, and we uphold that finding because it is not clearly erroneous. *See Thiel,* 264 Wis. 2d 571, ¶ 23. Given Carter's lack of credibility, this court cannot conclude from his testimony that the previous sexual assault "clearly occurred."

¶ 47. In a videotaped interview taken after Carter was charged, Cassandra told Officer Koch that she had seen her cousin's penis. The parties agree on little else. At one point in the interview, Cassandra apparently referenced the making of drinks. According to Carter, she was referring to "making juice" with her cousin

674

while his pants were down. The State, on the other hand, maintains that Cassandra's statement about making drinks was merely a reference to playing. The State contends that Cassandra's blank statement about seeing her cousin's penis was void of any sexual description: "there is nothing that says that she touched him, that he touched her, that there was anything that was sexual in nature." Because the videotaped interview did not appear in the record before this court, we are left to rely on the parties' competing interpretations. As it was relayed to us, the videotaped interview is too insufficient to support the conclusion that the previous sexual assault "clearly occurred."

¶ 48. Our conclusion that Carter's offer of proof fails the first prong of the *Pulizzano* test is enough to dispose of Carter's argument that evidence of the previous sexual assault is excepted from the rape shield law. *See, e.g., Dunlap,* 250 Wis. 2d 466, ¶ 29 (recognizing that this court need not go further in applying the *Pulizzano* test after one of the five prongs is not satisfied). Nevertheless, we move on to discuss the second prong and further conclude that Carter's offer of proof fails to demonstrate that the previous sexual assault "closely resemble[s]" that of the present case. *See Pulizzano,* 155 Wis. 2d at 656.

b. Did the prior act "closely resemble" this act?

¶ 49. In order to satisfy the second prong of the *Pulizzano* test, the defendant's offer of proof must show that the prior act "closely resembled" the act that the defendant is accused of committing. *Id* This court has refused to broadly interpret "closely resembled." *Dunlap,* 250 Wis. 2d 466, ¶ 23. We have recognized that evidence of prior sexual touching does not sufficiently

675

resemble a present allegation of sexual intercourse. *Dodson,* 219 Wis. 2d at 79.[16]

¶ 50. In *Dodson,* in analyzing whether a prior act "closely resembled" the act alleged in the underlying case, *see Pulizzano,* 155 Wis. 2d at 656, this court made the distinction between (a) a prior act of sexual touching and a present allegation of sexual intercourse, and (b) a prior act of sexual intercourse and a present allegation of sexual touching. *Dodson,* 219 Wis. 2d at 79. "Although evidence of prior sexual touching does not sufficiently 'resemble sexual intercourse,' it does not automatically follow that evidence of prior sexual intercourse does not resemble or involve sexual touching." *Id.* Indeed, "it is impossible to conceive" of a prior act of sexual intercourse that does not involve sexual contact. *Id.* Accordingly, in *Dodson,* this court concluded that the defendant satisfied the second prong of the *Pulizzano* test because the previous act of sexual intercourse commissioned against the victim necessarily involved, and hence "closely resembled," the sexual contact that the defendant was accused of. *Id.* at 78–79.

¶ 51. In *Michael R.B.,* we analyzed the converse scenario. 175 Wis. 2d at 736. The defendant, who was accused of having sexual intercourse with the child victim, made an offer of proof that the victim and her

---

[16] Wisconsin Stat. § 948.01(6) defines "sexual intercourse" as

> vulvar penetration as well as cunnilingus, fellatio or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction. The emission of semen is not required.

Carter was charged with forcing Cassandra to perform oral sex on him. Oral sex constitutes "sexual intercourse" as defined by § 948.01(6).

brother were previously seen touching each other's "private parts" while sitting together in a tire swing. *Id.* This court concluded that the defendant failed the second prong of the *Pulizzano* test, stating that it was "an insupportable leap of reasoning to conclude that two or three minutes of undefined sexual touching while sitting in a tire swing so closely resembles sexual intercourse as to satisfy the *Pulizzano* test." *Id.*

¶ 52. Here, Carter's offer of proof must fail the second prong of the *Pulizzano* test because the previous sexual assault against Cassandra does not "closely resemble[]" the act of sexual intercourse that Carter was charged with. *See Pulizzano,* 155 Wis. 2d at 656. Carter was charged with forcing Cassandra to perform oral sex on him, an act of "sexual intercourse." *See* Wis. Stat. § 948.01(6). Carter's offer of proof consists of testimony that Cassandra had previous sexual contact with her cousin, specifically that Cassandra "pulled on [her cousin's] penis to get him to ejaculate."[17] As this court has made clear, a previous act of sexual contact does not sufficiently resemble an act of sexual intercourse for purposes of satisfying the second prong of the *Pulizzano* test. *Dodson,* 219 Wis. 2d at 79. Similar to our analysis in *Michael R.B.,* it would require "an insupportable leap of reasoning" to conclude that the uncertain sexual touching that took place between Cassandra and her cousin "closely resembles" the act of oral sex that Carter

---

[17] In his brief, Carter concedes that the previous sexual assault did not involve oral sex: "The State correctly asserts that Mr. Carter did not and does not claim the assault by [her cousin] involved oral sex." It is therefore irrelevant that, according to Carter, Cassandra's statement to Officer Thomas (that she "closed her mouth tight" when she saw Carter's penis) indicated that Cassandra had some prior knowledge of oral sex.

was charged with. *See Michael R.B.*, 175 Wis. 2d at 736. "[W]e refuse to interpret the second prong of *Pulizzano* so broadly." *Dunlap,* 250 Wis. 2d 466, ¶ 23.

¶ 53. Because we conclude that Carter's offer of proof fails the first and second prongs of the *Pulizzano* test, we hold that evidence of the alleged previous sexual assault against Cassandra is not excepted from the rape shield law and is therefore inadmissible. Accordingly, Carter has failed to demonstrate that his defense was prejudiced by his trial counsel's decision not to present the evidence. Regardless of whether Sargent attempted to present evidence of the previous sexual assault, the result of the proceeding would have been the same.

## IV. CONCLUSION

¶ 54. To summarize, we conclude that the court of appeals improperly remanded the case to the circuit court for further proceedings. Carter's ineffective assistance of counsel claim fails under the two-part inquiry of *Strickland v. Washington.* First, his trial counsel's performance was not deficient. His counsel's strategic decision not to introduce evidence that the child victim was previously sexually assaulted was objectively reasonable considering all the circumstances. Second, even assuming that his counsel's performance was deficient, the deficiency did not prejudice Carter's defense. Evidence that the child victim was previously sexually assaulted would have been inadmissible under Wisconsin's rape shield law, Wis. Stat. § 972.11(2), and the narrow five-part test articulated in *State v. Pulizzano.* Accordingly, this court reverses the court of appeals' decision and upholds the judgment of the circuit court denying Carter's post-conviction motion for a new trial.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 55. ANN WALSH BRADLEY, J. (*concurring*). I agree with the majority that Carter did not receive ineffective assistance of counsel and is therefore not entitled to a new trial. I also agree with the majority that the evidence Carter presented at the post-conviction hearing was insufficient to demonstrate that he was prejudiced by his attorney's failure to seek the admission of evidence of a prior assault.

¶ 56. I write separately, however, because the majority goes further. It unnecessarily places its imprimatur on the attorney's "strategic decision," which was apparently made in ignorance of the law and left unaddressed a question that was fundamental to the defense in this case. Because the court should not needlessly ratify this attorney's questionable decision, I respectfully concur.

I

¶ 57. In *State v. Pulizzano*,[1] the court recognized an exception to the rape shield statute, Wis. Stat. § 972.11(2)(b). It concluded that a defendant may have a constitutional right to present evidence of a prior sexual assault to demonstrate an alternative source of the child's detailed sexual knowledge. Based on Sargent's testimony at the post-conviction hearing, the court of appeals determined that he "was unfamiliar with the *Pulizzano* exception to the rape shield statute." *State v. Carter*, No. 2008AP1185–CR, unpublished order at 4 (Wis. Ct. App. March 12, 2009). At the hearing, Sargent acknowledged that he did not "ever review a case called *State v. Pulizzano*."[2]

---

[1] *State v. Pulizzano*, 155 Wis. 2d 633, 456 N.W.2d 325 (1990).

[2] The following exchange took place between Carter's post-conviction counsel and Sargent:

¶ 58. The majority recognizes that it need not determine whether Sargent's performance was deficient, because "even assuming that [it] was deficient, the deficiency did not prejudice Carter's defense." Majority op., ¶ 3. The majority could have and should have decided this case based solely on a determination of no prejudice. Instead, the majority unnecessarily gives Sargent's performance a stamp of approval. Despite his apparent admitted ignorance of the relevant law and the failure of his purported strategy to address a question fundamental to the defense, the majority determines that the "strategic decision . . . was objectively reasonable considering all the circumstances." *Id.*

A

¶ 59. Why does the majority needlessly ratify a "strategic decision" when Sargent apparently made the decision without knowing the law? The majority sets the bar too low when it relegates knowledge of the law to merely a "better practice." It cautions "that the better practice is for counsel to always research and be familiar with pertinent legal authority." *Id.*, ¶ 34.

¶ 60. Ignorance of the relevant law is often considered deficient performance. Even the State appears to acknowledge deficient performance here. After scant

---

Q: Did you ever review a case called *State v. Pulizzano?*

A: No, I did not.

Q: Or any subsequent case that quotes the *Pulizzano* test?

A: Prior to trial, no, I did not.

Q: Did you do any research that led you to any conclusion as to the admissibility of the prior incident?

A: I did not go into researching of that issue.

briefing on deficiency, the State concludes: "[P]erhaps Sargent's decision not to pursue the matter further was not reasonable[.][3]

¶ 61. In *State v. Felton,* we thoroughly considered how defense counsel's ignorance of a possible defense strategy should be evaluated in an ineffective assistance claim. 110 Wis. 2d 485, 329 N.W.2d 161 (1983). We concluded that without knowledge of the applicable law, it is impossible for an attorney to "make a reasoned decision consistent with the standard of performance expected of a prudent lawyer," and that the court should not "ratify a lawyer's decision merely by labeling it . . . 'a matter . . . of trial strategy.' " *Id.* at 505–06, 502.

¶ 62. In that case, Rita Felton was routinely battered by her husband and shot him on a day when his physical abuse was especially acute. *Id.* at 489–92. Felton was charged with second degree murder. *Id.* at 488. Prior to trial, defense counsel quickly zeroed in on a theory of self-defense and therefore failed to further explore the statutes and discover an alternative defense. *Id.* at 505. Because counsel was ignorant of the heat-of-passion defense, "he never was in a position even to consider whether, in light of the facts, heat of passion was an appropriate defense." *Id.*

¶ 63. Post-conviction, the circuit court deferred to counsel's "strategic choice": "[T]here may have been some shortcomings in the matters handled during the trial, but very often that is a matter of trial strategy. . . .

[3] At oral argument, counsel for the State asserted that Sargent's strategy was reasonable. The court asked: "If he doesn't know what the facts are and he has not really carefully looked at *Pulizzano,* then how can he make a reasonable strategy?" The State's attorney responded, "I think I agree with that statement, that he can't."

[T]he defenses [Felton's attorney] put forth were a matter of choice and of trial strategy, and not grounds for a new trial." *Id.* at 498.

¶ 64. On review, we acknowledged that "this court is loath to interfere with a lawyer's exercise of professional judgment by a hindsight evaluation." *Id.* at 507. Nevertheless, we clarified that "strategic or tactical decisions must be based upon rationality founded on the facts and the law." *Id.* at 502. "We will in fact second-guess a lawyer if the initial guess . . . is the exercise of professional authority based upon caprice rather than upon judgment." *Id.* at 503.

¶ 65. We unanimously concluded that "[t]he failure to be informed of this defense in the circumstances of this case constitutes a glaring deficiency in trial counsel's knowledge of the law" and was deficient performance.[4] *Id.* at 505. We refused to "ratify a lawyer's decision merely by labeling it, as did the trial court, 'a matter of choice and of trial strategy.' " *Id.* at 502.

¶ 66. Here, Sargent acknowledges that he did not make a legal determination about whether evidence of the prior assault would have been admissible. *See* majority op., ¶ 15. Because of his apparent ignorance of *Pulizzano,* it appears impossible for him to "weigh alternatives and to make a reasoned decision" consistent with professional standards. *See Felton,* 110 Wis. 2d at 505–06. Instead, the decision was made in a legal vacuum. I cannot join the majority in putting a

---

[4] *See also State v. Thiel,* 2003 WI 111, ¶ 40, 264 Wis. 2d 571, 665 N.W.2d 305 ("[D]efense counsel cannot claim to have decided strategically to forgo interviewing a particular witness if counsel has not read the police report relating to that witness, because that would not be an informed decision.").

stamp of approval on a decision apparently made in ignorance of the applicable law.

## B

¶ 67. There is an additional reason that the court should not put its imprimatur on Sargent's questionable strategic decision. Sargent's purported strategy left unaddressed a fundamental question: was Cassandra telling the truth about the source of her detailed sexual knowledge?

¶ 68. At the post-conviction hearing, Sargent explained that he wanted to avoid challenging the credibility of a sympathetic five-year-old girl. Instead, he asserted, he planned to attack her mother's credibility and demonstrate that the mother pressured Cassandra into making false allegations. Majority op., ¶ 14. The majority concludes that this strategy was reasonable:

> [B]y attempting to demonstrate that Cassandra gained her detailed sexual knowledge, not from Carter, but from a previous sexual assault by her cousin, Sargent would necessarily have been asking the jury to discredit the testimony of a five-year-old victim of sexual assault. It is certainly reasonable that Sargent was more confident asking the jury to discredit the mother, Denise, instead of directly attacking the child victim.

*Id.,* ¶ 33.

¶ 69. Although it might have been worthwhile to challenge the mother's credibility, it was essential to the defense that Sargent challenge the child's credibility as well. Even if the mother had originally fabricated the story, it was the child who was repeating as true the mother's allegations. In his opening argument, Sargent argued to the jury that "there[] really[] is no clear evidence that Michael Carter did anything improper

towards this girl." Yet, there was such evidence—Cassandra's own testimony.[5]

¶ 70. If the jury fully credited this testimony, then the allegations were true and Carter was guilty. Thus, it was essential to the defense that Sargent challenge Cassandra's credibility. Unless Sargent was able to undermine her version of events, the jury would be forced to conclude that Carter did in fact do something "improper towards this girl."

¶ 71. In fact, contrary to the "strategy" he described at the post-conviction hearing, Sargent did make attempts to discredit Cassandra. Ultimately, she testified that she "want[ed] to get away from that house" and from Carter. Certainly, the jury might infer that Cassandra had a motivation to tell a story that would keep Carter away.

¶ 72. Yet, Sargent's "strategy" left unaddressed one fundamental question. How was a girl of that age able to recount a sexual incident with many sexual details had she not been assaulted by Carter?[6] In *Pulizzano,* we explained that in the absence of evidence

---

[5] Cassandra testified that she and Carter were sitting on the couch, that her mouth was on his private part, and that Carter was pushing on her head saying "[k]eep on going down." She testified that afterwards, she went to the bathroom to wash up because she "had some white stuff" on her hand.

[6] In closing arguments, the prosecutor repeatedly emphasized Cassandra's detailed sexual knowledge as proof of Carter's guilt. She asked the jury to consider Cassandra's "opportunity for observing and knowing the matters testified to . . . . And the reason I say that is, the proof is really in the pudding. The proof is in what this little girl said. . . . [She testified she] could see the dark hair of Mr. Carter's groin. . . . Now, she doesn't know why that's important. She doesn't know that men have hair there, but she observed that . . . . And that is something that a

684

of an alternative source for a child's detailed sexual knowledge, the jury would likely make the "logical and weighty inference" that the alleged assault had occurred. 155 Wis. 2d at 652.

¶ 73. The majority's lengthy reiteration of portions of the testimony and argument is notable only for what it does not demonstrate. The record does not demonstrate that Sargent fully followed through with his "strategy" of demonstrating that the mother pressured Cassandra into making untruthful allegations. Further, Sargent never argued that the mother provided Cassandra with the necessary adult information to tell a convincing story.[7] In light of these shortcomings, it is surprising that the majority concludes that Sargent's purported strategy was "reasonable under the circumstances."

## II

¶ 74. Here, the majority's willingness to ratify Sargent's questionable trial strategy, which was apparently made in ignorance of the applicable law, is troublesome. Where there is ignorance of the law, you cannot excuse a lawyer's performance by labeling it trial strategy.

---

six-year-old is not gonna know." The prosecutor repeated this theme when discussing Cassandra's knowledge of erections, ejaculation, and oral sex.

[7] As the majority reports, there was evidence that Carter and Denise had a "broken relationship." *See* majority op., ¶¶ 26–29. Yet Sargent never explained to the jury how the hostility in the household could be relevant in evaluating the likelihood of Carter's guilt. As the majority acknowledges, the only direct suggestion that Denise could be the ultimate source of the allegations came from the prosecutor, rather than defense counsel. *See id.,* ¶ 30.

¶ 75. The majority, however, ultimately concludes that "irrespective of whether Sargent's performance was deficient, Carter's ineffectiveness claim still fails because the deficiency did not prejudice Carter's defense." Majority op., ¶ 36. I agree.

¶ 76. The law is clear that Carter is not entitled to a new trial unless he demonstrates that (1) his counsel's performance was deficient and (2) the deficiency prejudiced his defense. It is well settled that the court need not decide whether an attorney's performance was deficient if the court has already determined that there was no prejudice. *Id*, ¶ 21 (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)).

¶ 77. To demonstrate prejudice, Carter has the burden to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. In this case, that means that Carter had to show a reasonable probability that the evidence would have been admitted and would have been persuasive to the jury.[8]

¶ 78. I agree with the majority that the evidence Carter presented at the post-conviction hearing was insufficient to satisfy the *Pulizzano* test. *See* majority op., ¶¶ 39–53. Without showing a reasonable probability that the evidence of an alleged prior assault would have been admitted at trial, Carter has not demon-

---

[8] As we explained in *Felton,* "[t]here are, of course, a multitude of cases in which a lawyer's failure to inform himself of a particular defense could in no way be prejudicial[.]" 110 Wis. 2d at 507. "If the failure could have had no adverse effect on the defendant, the representation would not have been any more effective had that failure not occurred." *State v. Fencl,* 109 Wis. 2d 224, 241, 325 N.W.2d 703 (1982) (Heffernan, J., concurring).

strated that he was prejudiced by Sargent's apparent ignorance of the law. Therefore, he is not entitled to a new trial.

¶ 79. Generally, an appellate court should decide cases on the narrowest possible grounds. *State v. Blalock,* 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989). I am at a loss to understand why the majority feels compelled to go further here. I cannot understand why it unnecessarily concludes that Sargent made a "reasonable strategic decision," even though this decision was apparently made in ignorance of the law and left unaddressed a question fundamental to the defense in this case. Accordingly, I respectfully concur.

¶ 80. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence.