¶ 55.
ANNETTE KINGSLAND ZIEGLER, J.
(dissenting). Even if, as the court today concludes, the *114 circuit court below erred in its assessment of the validity of the subpoena of Jacqueline Brown ("Brown"), Keimonte Antonie Wilson, Sr. ("Wilson") failed to object to that error. Under well-established precedent, Wilson therefore forfeited the right to direct review of the alleged error and this court will only inquire into whether Wilson's counsel was constitutionally ineffective in neglecting to challenge the circuit court's ruling on the subpoena. See, e.g., State v. Erickson, 227 Wis. 2d 758, 765-67, 596 N.W.2d 749 (1999).
¶ 56. Unfortunately, I must dissent because the court deviates from this "normal procedure in criminal cases," analyzing Wilson's claim on the merits without adequate justification. Id. I would adhere to precedent and analyze whether Wilson received the effective assistance of counsel. I conclude that Wilson's ineffective assistance of counsel claim fails because he has not demonstrated that he was prejudiced by his counsel's performance. Suppression would have occurred with or without Brown's testimony, and the decision of the court of appeals should be affirmed. Accordingly, I respectfully dissent.
h — I
f 57. This case arose following an incident on May 2 or 3, 2013,[1] in Milwaukee, Wisconsin, during which Wilson was seen exiting an alleged "known and active drug house" and was searched by a Milwaukee police officer; the officer found suspected crack cocaine on his person. On May 8, 2013, a criminal complaint was filed against Wilson in Milwaukee County circuit court charging him with one count of possession with *115 intent to deliver a controlled substance (cocaine) in the amount of between 5 to 15 grams, second and subsequent offense, in violation of Wis. Stat. § 961.41(lm)(cm)2. See also Wis. Stat. § 961.48(l)(b).
f 58. On June 24, 2013, Wilson filed a motion to suppress evidence of the crime. On December 3, 2013, a hearing was held on the motion. The first to testify was Officer William Savagian ("Officer Savagian") of the Milwaukee Police Department. Officer Savagian testified that on May 2, 2013, at about 7:00 p.m., he and his two partners — one male, one female — were in the area of West Meinecke Avenue and North 18th Street in the City of Milwaukee. Officer Savagian had worked in this particular area for over seven years. Officer Savagian was parked on the street "to conduct followup on a reckless endangering safety complaint" when he saw Wilson exit a red sport utility vehicle ("SUV") and walk into the back yard of a "known and active drug house." The SUV was "more or less parked behind the house in . . . what almost was like a vacant field." There was a sign in the field that read "no parking, dumping or trespassing."
¶ 59. Officer Savagian lost sight of Wilson for "not more than 15, 20 seconds," after which he saw Wilson walk back to his vehicle and reenter it. At that time Officer Savagian and one of his partners, Officer James Hunter ("Officer Hunter"), were already in the process of approaching the SUV.[2] According to Officer Savagian, his speed was a "normal walk" and the officers' guns were not drawn. Officer Savagian walked up to the driver's side door, which Wilson opened. *116 Officer Hunter went to the passenger side of the vehicle. There was one additional individual in the front passenger seat.
¶ 60. Officer Savagian testified that he believed he would have identified himself as a police officer. He then asked Wilson if he had any drugs or firearms on his person. Wilson responded in the negative, exited the vehicle without being asked, stuck his arms out "like an airplane" and told Officer Savagian he could search Wilson.[3] Officer Savagian stated that Wilson was "shaking" and his eyes "became real wide," "[wjider than I guess normal people — or someone that is scared would look."
¶ 61. Officer Savagian asked Wilson, " ['] If I do search you, am I going to find anything on you[?']" Wilson replied "no." With his arms still out, Wilson informed Officer Savagian that he was on probation. Officer Savagian asked whether it was "for drugs or guns," and Wilson "indicated that it was for drugs." Officer Savagian searched Wilson and found, among other things, "a plastic sandwich bag" containing "three individually bagged up . . . chunks of this white chunky substance" — "suspected crack cocaine." Officer Savagian gave the substance to one of his partners and told Wilson he was going to be handcuffed.
*117 ¶ 62. After Officer Savagian's testimony at the hearing, the defense called Darryl Roberts ("Roberts"). Roberts testified that Wilson was a friend of his as well as Roberts' sister's boyfriend. On the date and at the time in question, Roberts was sitting in the front passenger seat of a "truck" with Wilson. Roberts denied that the lot was vacant, stating, "[i]t's our yard."[4] Wilson was "talking to [Roberts] about school." Wilson received a call from his father and then stepped out of the vehicle to go to his father's house. About five minutes later, Wilson returned to the vehicle, whereupon three officers arrived and ordered Wilson and Roberts out of the vehicle. In Roberts' telling, two of the officers, both male, had "their guns out." One of the male officers was on the driver's side of the vehicle "pointing the gun at" Wilson. Roberts agreed that the officer "had both hands on the gun" and the gun was "pointed out directly in front of him." The other male officer "was coming to the passenger side with his gun drawn telling [Roberts] to get out of the car." That officer was holding his gun in the same way as the other officer.
¶ 63. Wilson and Roberts exited the vehicle; Roberts testified that the officer put his gun back into its holster, "grabbed [his] arm" and then Roberts "stepped out." Without being asked, Roberts was immediately searched. The officer asked Roberts if he had "anything illegal on [him]," and Roberts replied that he did not. Meanwhile the female officer was "walking around the premises" and "[s]earching around the truck."
¶ 64. After Roberts testified, Wilson's attorney explained that one of the defense witnesses, Brown, had not "responded to the subpoena by attending"; *118 Brown was "at work" and "couldn't find anybody to cover her shift." Wilson's attorney informed the court:
[fit's my understanding that if she were to testify, she would be testifying that she was at the residence at the time that the police came to the what is essentially the back of her residence. It's my understanding that she would testify that she observed them with guns drawn approach the vehicle and take both my client and her son, [Roberts], out of the vehicle. And I don't want to presume too much on the testimony, but it's my understanding that that is very clearly what she would be testifying to.
¶ 65. Wilson's attorney stated that he was "wondering if the Court may be willing to grant one adjournment for the taking of [Brown's] testimony." The State took no position on the matter. The circuit court commented:
The issue is ... do we need to have a body attachment and have her brought to continue this hearing. ... [fif I'm going to set another date, she's going to be picked up with a warrant.... I'm not going to set another date and then hope that this time she decides to come.
f 66. In considering whether to issue a body attachment or whether to proceed without Brown, the circuit court remarked that the manner in which the officers approached the vehicle seemed to be "the only key issue of all the testimony" thus far. The State then took the position that the circuit court should issue a body attachment. Wilson's attorney began to suggest that perhaps the circuit court could call Brown to have her come into court. The circuit court rejected this approach: "I don't cajole witnesses to come to my court. There will be a body attachment." Shortly thereafter Wilson's attorney stated, "Judge, I hate to make the *119 request, but I think that I have no other choice but to ask that the Court issue a body attachment."
¶ 67. The circuit court asked to see the subpoena. However, upon examination, the circuit court concluded that the subpoena was not valid and that an attachment could not be issued after all. The circuit court commented: "It looks like [the subpoena] was only served once and it was served by substituted service, and . . . under Wisconsin law, you have to attempt on a couple of occasions and make reasonable efforts before you can serve by substituted service." The circuit court then questioned Wilson's attorney and received the following answer:
THE COURT: ... [D]o you have — do you believe that I'm wrong on the law?
[WILSON'S ATTORNEY]: I don't have any reason to challenge the court on the law.
Consequently, the hearing proceeded without Brown's testimony.
f 68. Wilson testified next. Wilson stated that on May 2, 2013, at about 7:00 p.m. to 7:30 p.m., he was "parked in back of [his] [girlfriend's] house — mother's house" and that Roberts was with him. Wilson denied being parked in the vacant lot. Wilson left to urinate in his father's back yard and returned to the vehicle "probably like less than a minute" later. Upon his return, Wilson saw "three officers running up with their guns pointed at — in [his] direction." The officers were running at a "medium jog," and all three officers had their guns out and "pointed." According to Wilson, the female officer was running behind the two male officers. One officer went to the driver's side of the vehicle and another went to the passenger's side of the vehicle. An officer told Wilson to get out of the truck. *120 Wilson testified that he did not at first realize that the officers were officers because they were in plain clothes. Wilson was scared and got out of the car because he thought the officers were going to shoot and because he did not know what was going on.
¶ 69. Once Wilson was out of the car, one of the officers stated that the officers were "Milwaukee police." Wilson did not offer to be searched, but an officer started patting him down with one hand and with his gun out and pointed at Wilson in the other hand. Wilson saw a bulletproof vest on the officer. The officer asked Wilson where he was coming from, and Wilson explained that he was coming from his father's house. The officer asked whether Wilson was on probation, and Wilson explained that he was. When asked why he was on probation, Wilson answered that he was on probation "for drugs." Wilson testified that he stutters when is he is scared, and that he was stuttering at the time. Wilson had his arms raised up in the air (as opposed to "like an airplane") and felt he had "no choice" but to let the officer reach into his pocket. Wilson was eventually handcuffed. The officer never stated aloud that he had found anything on Wilson's person. Besides this testimony, evidence was introduced at the hearing that Wilson had three prior convictions.
¶ 70. The State called Officer Hunter as a rebuttal witness. Officer Hunter's testimony was similar to Officer Savagian's except that Officer Hunter testified that Wilson was away from his vehicle for approximately, and no more than, ten minutes and that Officer Griffin walked toward the vehicle with Officer Sava-gian and Officer Hunter. The following exchange occurred during Officer Hunter's testimony:
*121 Q: At any point in time prior to approaching the parked truck did you have your weapon drawn?
A: No.
Q: Did Officer Savagian have his weapon drawn did you see?
A: No.
Q: Officer Griffin?
A: No.
[[Image here]]
Q: At any point of time in this encounter with either [Roberts] ... or Mr. Wilson did any of the officers have their guns out?
A: No.
¶ 71. Finally, the State called Officer Savagian back to the stand. The following exchange occurred:
Q: At any point in time during the apprehension of Mr. Wilson, either before, during or after the apprehension of Mr. Wilson, did you draw your service weapon?
A: I did not.
Q: Did you see either Officer Griffin or Officer Hunter draw their weapons?
A: I did not.
Q: On that day ... do you recall whether or not you were wearing a [bulletproof] vest?
A: I was not. ...
Q: Have you conducted a — in your career as a Milwaukee police officer, have you ever conducted a search of a person by holding a gun in your hand and searching with your other hand?
*122 A: I have; however, it's only under the most like high intense moments. Maybe you are making an entry on a warrant and someone runs at you and you just pat him down. It's — it's under the most duress situation you could be in. It's not ideal at all.
On cross-examination, Officer Savagian agreed that he did not actually know whether Officer Griffin drew her gun or not since she was not in his line of vision after the three exited their vehicle, but added that "she wasn't anywhere around" Officer Savagian and Officer Hunter.
¶ 72. The circuit court denied Wilson's motion to suppress, concluding that the officers' interaction was supported by reasonable suspicion and that the search of Wilson was consensual. The court explained that it had had "the opportunity to hear the testimony and assess the demeanor and . . . believability of the witnesses." It concluded that "regarding this gun situation" it found "the officers' testimony to be much more credible and believable than Mr. Wilson and Mr. Roberts. [Es]pecially given the inconsistencies between the testimony of Mr. Wilson and Mr. Roberts."
¶ 73. The court stated that it found Officer Sava-gian to be a "very credible witness." With regard to the search of Wilson, the court noted that Officer Savagian had testified that searching with a gun in one hand was reserved for a "very unusual high stress situation," and that although "high stress is a relative term," "for police officers doing this sort of work every day, this is hardly a high stress time what was described to me here." Additionally, while Officer Sava-gian "testified with a detailed recollection of what was said and what was offered" at the time of the search, Wilson simply testified "that he did not offer to let the officers search him."
*123 ¶ 74. The court also found Officer Hunter to be "very believable," "very calm as he testified," and "very clear that none of the officers had their guns drawn": "Not only what he was saying, but basically the way he was saying it led me to believe that he was true — that he was telling the truth. And he was not in the courtroom when the other witnesses were testifying regarding the guns."
¶ 75. The court found less credible a number of other aspects of the testimony of Roberts and Wilson, such as the way the officers were allegedly carrying their guns, the account of Roberts being pulled out of the car, and the notion that Officer Griffin would have approached the SUV with her gun pointed while behind the other two officers. The court also noted that Roberts was "very specific that only two of the officers had their guns out." The court stated:
At the end of the day, I find Officer Savagian's explanation much more credible as to — rather than this sort of A-Team paramilitary attack on the car by three officers, especially with the third officer basically having her gun at her colleague's heads which I didn't find to be credible ....
The court observed that "under these circumstances, there was no testimony really other than Mr. Wilson who unfortunately has been convicted of a crime three times, so his credibility is somewhat at issue. Plus he has a vested interest in this case."
¶ 76. The court also remarked that it did not "see at the end of the day how [Brown's testimony] would have assisted the Court or assisted Mr. Wilson with his motion." The court explained that while "it would be one thing if both Mr. Roberts and Mr. Wilson had testified totally consistently," they had not done so. *124 Consequently, Brown would either have been "backing one or the other or maybe providing yet an additional explanation."
¶ 77. On December 23, 2013, Wilson pleaded guilty to one count of possession with intent to deliver a controlled substance (cocaine) in the amount of greater than 5 to 15 grams.[5] A judgment of conviction was entered, and the circuit court sentenced Wilson to three years of initial confinement and two years of extended supervision.
¶[ 78. On January 6, 2015, Wilson filed a motion for postconviction relief. On March 12, 2015, the circuit court denied the motion. On April 1, 2015, Wilson filed a notice of appeal. On July 6, 2016, the court of appeals affirmed the judgment of conviction and the circuit court's order denying Wilson's motion for postconviction relief. State v. Wilson, No. 2015AP671-CR, unpublished slip op. (Wis. Ct. App. July 6, 2016) (per curiam). On August 4, 2016, Wilson filed a petition for review in this court. On October 11, 2016, this court granted the petition.
II
¶ 79. The issues raised on this appeal pertain to the circuit court's ruling that the subpoena of Brown was not valid. But Wilson's attorney was asked by the circuit court point-blank if he wished to object to the circuit court's ruling on the subpoena, and the attorney declined to do so. "The absence of any objection warrants that we follow 'the normal procedure in criminal cases,' which 'is to address waiver within the rubric of the ineffective assistance of counsel.'" State v. Car *125 prue, 2004 WI 111, ¶ 47, 274 Wis. 2d 656, 683 N.W.2d 31 (quoting Erickson, 227 Wis. 2d at 766).
¶ 80. Put differently, the court today validates Wilson's approach of: (1) consenting to the circuit court's ruling on the subpoena at the suppression hearing; (2) waiting to see if he succeeded on his motion to suppress; and (3) only after losing that motion, objecting to the court's ruling on the subpoena. See, e.g., Erickson, 227 Wis. 2d at 766 ("If the waiver rule did not exist, a party could decline to object for strategic reasons and raise the error only when that party needed an advantage at some point in the trial."); State v. Caban, 210 Wis. 2d 597, 600, 611, 563 N.W.2d 501 (1997) (defendant waived issue of probable cause to search a vehicle by failing to raise the issue before the circuit court). On the other hand, Wilson is not without a remedy. He possesses state and federal constitutional rights to the effective assistance of counsel and may challenge the performance of his attorney in failing to object to the court's ruling on the subpoena. See, e.g., State v. Thiel, 2003 WI 111, ¶ 18, 264 Wis. 2d 571, 665 N.W.2d 305 (citing U.S. Const. amends. VI, XIV; Wis. Const. art. I, § 7); Erickson, 227 Wis. 2d at 766. I now conduct our well-established ineffective assistance inquiry, and conclude that Wilson's ineffective assistance of counsel claim fails because he was not prejudiced by his counsel's performance.
HH HH HH
¶ 81. "Whether a convicted defendant received ineffective assistance of counsel is a two-part inquiry. First, the defendant must prove that counsel's performance was deficient. Second, if counsel's performance was deficient, the defendant must prove that the *126 deficiency prejudiced the defense." State v. Carter, 2010 WI 40, ¶ 21, 324 Wis. 2d 640, 782 N.W.2d 695 (citations omitted). Relevant to this case, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. 668, 697 (1984).
¶ 82. Assuming that, as the court today holds, the circuit court below erred in its assessment of the validity of the subpoena under review, I conclude that it is unnecessary to determine whether Wilson's attorney performed deficiently in failing to object to the court's ruling. This is so because even if the attorney performed deficiently, that deficiency did not prejudice Wilson.
¶ 83. To show prejudice Wilson must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Carter, 324 Wis. 2d 640, ¶ 37 (quoting Strickland, 466 U.S. at 694). Wilson must "offer more than rank speculation to satisfy the prejudice prong." Erickson, 227 Wis. 2d at 744. He cannot meet this burden.
f 84. The circuit court made clear that it found Officer Savagian and Officer Hunter to be highly credible witnesses and found their "testimony to be much more credible and believable than Mr. Wilson and Mr. Roberts." The circuit court was aware that Brown would likely testify that she saw the police officers approach the SUV with guns drawn and take Wilson and Roberts out of the car, but this did not change its findings at the conclusion of the suppression *127 hearing. The circuit court simply did not consider a "sort of A-Team paramilitary attack on the car" likely under the circumstances.
¶ 85. Additionally, as the circuit court noted, Wilson and Roberts were not consistent in their testimony. Thus, had Brown testified, her testimony likely would have been inconsistent with either Wilson's account, Roberts' account, or both. For example, Wilson testified that all three officers had their guns drawn as they approached the SUV, while Roberts was "very specific that only two of the officers had their guns out." Perhaps Brown would have testified that two officers had drawn their guns. Perhaps Brown would have testified that three officers had drawn their guns. Or perhaps Brown would have provided a new version of events. Regardless, nothing but "rank speculation" supports the conclusion that Brown would have provided an account so credible — despite being inconsistent with either Wilson's testimony, Roberts' testimony, or both — that the circuit court would have immediately dismissed the testimony of Officer Savagian and Officer Hunter and suppressed the challenged evidence. Indeed, this would be highly -unlikely: on top of the circuit court's extensive findings regarding the relative credibility of Officer Savagian, Officer Hunter, Roberts, and Wilson, Brown would have been starting at a disadvantage from a credibility perspective; as Roberts' mother, she obviously had an interest in the case.
f 86. Thus, assuming the circuit court should have obtained Brown's testimony and that Wilson's attorney was deficient in failing to object to the circuit court's actions, Wilson has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have *128 been different." Carter, 324 Wis. 2d 640, ¶ 37 (quoting Strickland, 466 U.S. at 694). His ineffective assistance claim fails.
IV
¶ 87. Even if, as the court today concludes, the circuit court below erred in its assessment of the validity of the subpoena of Brown, Wilson failed to object to that error. Under well-established precedent, Wilson therefore forfeited the right to direct review of the alleged error and this court will only inquire into whether Wilson's counsel was constitutionally ineffective in neglecting to challenge the circuit court's ruling on the subpoena. See, e.g., Erickson, 227 Wis. 2d at 765-67.
¶ 88. Unfortunately, I must dissent because the court deviates from this "normal procedure in criminal cases," analyzing Wilson's claim on the merits without adequate justification. Id. I would adhere to precedent and analyze whether Wilson received the effective assistance of counsel. I conclude that Wilson's ineffective assistance of counsel claim fails because he has not demonstrated that he was prejudiced by his counsel's performance. Suppression would have occurred with or without Brown's testimony, and the decision of the court of appeals should be affirmed. Accordingly, I respectfully dissent.
f 89. I am authorized to state that Justice MICHAEL J. GABLEMAN joins this opinion.

 There is a discrepancy in the record regarding the date of the incident.

 Officer Savagian was not aware of the position of the third, female officer at this point in time.

 Officer Savagian testified, "I don't know if that was his exact words, but it was — him stepping out with his arms raised was implied." Pressed on this point on cross-examination, Officer Savagian elaborated:
Yes, he did say I could search him. I don't know if he — what I meant to say, the exact wording of that, but his arms extended obviously implies more of a willingness to search and there was never a like, ["]hey, I don't want you to search me["] or any kind of •— he never stopped the search either.

 Roberts testified that he lived on West Meinecke.

 The second and subsequent enhancer was dropped.