# COURT OF APPEALS
## DECISION
## DATED AND FILED

## February 7, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1382**

STATE OF WISCONSIN

Cir. Ct. No. 2022TP14

IN COURT OF APPEALS
DISTRICT II

IN RE THE TERMINATION OF PARENTAL RIGHTS TO S.L., A PERSON UNDER THE AGE OF 18:

SHEBOYGAN COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,

PETITIONER-RESPONDENT,

V.

A.P.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Sheboygan County: KENT R. HOFFMANN, Judge. *Affirmed*.

¶1      GROGAN, J.[1]   A.P. appeals from an order terminating her parental rights to her daughter Grace[2] and also challenges an order denying her postdisposition motion, which sought to vacate the termination order on the basis of ineffective assistance of counsel.[3]   A.P. claims her trial counsel provided ineffective assistance during the grounds phase of the proceedings by failing to advise her about the need to submit an affidavit in opposition to the Sheboygan County Department of Health and Human Services' (Department) partial motion for summary judgment.  This court affirms.

## I. BACKGROUND

¶2      Grace was born in December 2018 to A.P. and J.L., who were not married.  Grace and A.P. tested positive for methamphetamines at Grace's birth, which led to an investigation as to whether Grace could go home with her parents.  Grace's maternal grandmother initially took Grace into her home as part of Grace's protective placement plan.  However, the Department took temporary physical custody of Grace after approximately one month and placed her with a great aunt (Evelyn) and the aunt's spouse (Oliver) instead.[4]   The Department thereafter filed a petition alleging Grace was a child in need of protection or

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2]  Grace is a pseudonym used for purposes of confidentiality.  *See* WIS. STAT. § 809.81(8).

[3]  The Honorable Kent R. Hoffman entered the order terminating A.P.'s parental rights to Grace.  After filing her notice of appeal, A.P. moved this court to remand for a postdispostion hearing.  This court granted that motion.  The Honorable Natasha Torry entered the order denying A.P.'s postdisposition motion.

[4]  Evelyn and Oliver are also pseudonyms.

services, and in September 2019, the circuit court found Grace to be in need of protection or services and set conditions to be met before Grace could be returned to the parental home.

¶3       A.P. did not satisfy the conditions for Grace's return.  Although she had supervised visits with Grace approximately once a week, she sometimes did not attend, arrived late, or showed up unexpectedly.  As a result of these inconsistencies—as well as A.P.'s failure to maintain contact with Jana Harrington, the assigned social worker, and failure to keep scheduled appointments with the Department—Harrington suspended A.P.'s visits with Grace in August 2021.  The letter informing A.P. of the suspended visits stated that Harrington was "placing [A.P.'s] visits with [Grace] on hold … until [she met] with [Harrington][.]"  Visits never resumed.  Consequently, in June 2022, the Department filed a petition seeking to terminate A.P.'s parental rights.[5]

¶4       The petition alleged three grounds for termination:  (1) abandonment as defined in WIS. STAT. § 48.415(1)(a)2; (2) continuing need of protection and services as defined in § 48.415(2)(a); and (3) failure to assume parental responsibility as defined in § 48.415(6)(a).  As to the abandonment period, the Department alleged A.P. abandoned Grace during the period running from August 25, 2021, through June 13, 2022.[6]

---

[5] The petition also sought to terminate J.L.'s parental rights.  This appeal, however, concerns only A.P.

[6] The Department's initial summary judgment brief identified the abandonment period as August 25, 2021, through June 13, 2021; however, the Department later clarified that June 13, 2021, was a typo and that the abandonment period was August 25, 2021, through June 13, 2022.

¶5 A.P. contested the petition, and the Department subsequently filed a motion for partial summary judgment as to unfitness. In its motion, the Department asserted there were no disputed issues of material fact on the abandonment ground because Grace had been placed outside of her parents' home since birth, A.P. had the required termination of parental rights notice, and A.P. failed to visit or communicate with Grace for a period of three months or longer. The Department filed affidavits from Evelyn, Oliver, Harrington, and the juvenile court clerk in support of the motion. The Department also preemptively argued that it did not believe there was "anything near 'Good Cause'" for A.P.'s failure to visit and communicate with Grace.

¶6 A.P. opposed the Department's partial summary judgment motion and specifically pointed to Harrington's suspension of her visits with Grace and Grace's young age—suggesting communication would have been meaningless—in arguing she had good cause for her lack of contact with Grace. Trial counsel attached two exhibits—purported Facebook messenger exchanges between A.P. and Evelyn showing dates of January, February, March, and October 2022 and two pages from the eWiSACWIS[7] notes from the case file—in support of A.P.'s response. The only Facebook messenger chat that appears to reference Grace is a message that A.P. purportedly sent to Evelyn in October 2022—well outside the abandonment period—stating "Please take care of my baby!" The relevant eWiSACWIS notes include what appears to be a copy of the visitation suspension letter dated August 4, 2021, that Harrington sent to A.P. and an entry dated August 25, 2021, indicating that Harrington had returned a phone call to A.P.

---

[7] eWiSACWIS is the abbreviation for Wisconsin's Statewide Automated Child Welfare Information System.

Trial counsel also indicated in the brief that there was "additional evidence of communication with the placement provider" that A.P. was "in the process of getting to counsel."[8]  It does not appear from the Record, however, that A.P. ultimately provided the referenced "additional evidence of communication[.]"

¶7      With its reply, the Department filed supplemental affidavits refuting A.P.'s arguments.  It asserted that A.P.'s response lacked support by affidavits or other evidence, that Harrington had put visits on hold but that A.P. could have resumed visits by meeting the social worker's requirements,[9] and that A.P. failed to present any evidence she was unable to meet these requirements.  The Department also argued that A.P. failed to prove that communication with Grace would have been meaningless due to her young age because A.P. could have sent cards, pictures, or messages to Grace.

¶8      In February 2023, the circuit court held a hearing on the motion and found that A.P. had failed to demonstrate that any genuine issues of material fact existed as to good cause.  The circuit court first noted that defeating a summary judgment motion requires "the opposing party [to] set forth facts showing there is a genuine issue for trial"—meaning that "the evidence is such that a reasonable jury could return a verdict for the … non-moving party"—and then went on to explain that establishing abandonment requires a showing that Grace was "placed or continued in a placement outside [A.P.'s] home by a court order," that the court order "contain[ed] the notice required under Chapter 948 or Chapter 938 of

---

[8]  It is unclear from the Record what that additional evidence may have entailed.

[9]  Although both A.P. and the Department referred to Harrington's "requirements" in their respective summary judgment briefs, the only "requirement" specifically referenced in the visitation suspension letter was that A.P. meet with Harrington.

Wisconsin Statutes," and that A.P. had "failed to visit or communicate with [Grace] for a period of three months or longer." The court found that the Department, through its affidavits, had established that Grace had been placed outside of A.P.'s home pursuant to a court order containing the required notice as well as that A.P. had failed to visit or communicate with Grace for a period of three months or longer. Having determined that there were no disputed issues of material fact as to those elements,[10] the court went on to address A.P.'s good cause argument:

> [A.P.] has raised a good cause argument, which is part of the jury instruction, and that would be -- the burden there is on the mother to establish good cause for the failure to visit or communicate with the child. And the court has reviewed the mother's submission as well as the two documents in support. Um, and I do find that, first of all, there is no affidavit submitted beyond the documents, and specifically I'm referring to document 63 and 64[11] in the court file. Those are the attachments for documents that [A.P.'s trial counsel] submitted with her -- the mother's response to the motion for summary judgment. And I would note that, um, it does indicate that the -- and I'm looking specifically at document 64. The social worker indicates that I am placing your visits with [Grace], the child, on hold effective today, August 4, 2021, until you meet with me, meaning the social worker, at the Sheboygan County Department of Health and Human Services. Um, so that is really kind of what the mother's response is, is that shows good cause to -- for not visiting the child.
>
> And the court here agrees with the public and the guardian ad litem that the mother's response here does not demonstrate a material issue of fact in dispute. The record is clear that while Social Worker Harrington in this case put the in-person visits on hold, that it says until you meet with

---

[10] A.P. conceded in her summary judgment brief "that the first two elements under WIS. STAT. § 48.415 (1)(a)(2) [were] met."

[11] Document 64 appears to be the same document attached to the Harrington affidavit the Department submitted in conjunction with its summary judgment reply brief.

me. There is no showing by the mother here of any reason why she didn't meet with the social worker to establish the good cause argument. Additionally, um, that did not prevent other forms of communication, which could include phone calls, letters, things of that nature. So I do find that the mother has not established her burden of demonstrating good cause here such that it would raise a material issue of fact for the fact finder.

I would note that the mother has not presented any evidence on any other efforts to meet the condition of re-establishing the visitation or how that requirement prevented her from communicating with the child by other means.

As to whether the child's age prevented meaningful contact with the child, I also find that the mother has failed to meet her burden on that. The child could have received pictures, letters, as I said, phone calls, and I don't show that the mother has met the burden to show that there's a material issue of fact here that the age of the child prevented any meaningful contact or would have rendered the contact meaningless.

¶9      The case proceeded to a dispositional hearing in April 2023 during which only Harrington and J.L. (Grace's father) testified. Harrington testified that A.P. and J.L. stopped showing up for supervised visits for a number of reasons, and when they did come, they brought Grace sugary foods—despite being told not to because it gave Grace stomachaches. Harrington explained that she put the visits on hold in August 2021 because A.P. was: (1) not honoring the visitation schedule; (2) showing up when not expected; (3) not giving proper notice for her visits; and (4) not having "meaningful interaction" with Grace when she did visit. Harrington also had concerns about A.P.'s noncooperation with her in regard to developing a "family interaction plan[.]" Harrington further testified that at times she could not find A.P., that A.P. failed to respond to her efforts to reach A.P., and that she had concerns about A.P.'s potential illegal drug use.

¶10     Harrington met with A.P. in 2022—many months after she had sent A.P. the visitation suspension letter—and shared the rules A.P. needed to follow to resume visitation with Grace. However, after sharing that information and telling A.P. that "if she could abide by those rules she could certainly see [Grace]," Harrington could not locate A.P. Harrington testified that A.P. ignored her phone calls and letters and that when she asked A.P. why A.P. never responded, A.P. said "she didn't think it was in [Grace's] best interest that she contact me." This pattern went on from August 2021 through the end of 2022. Visitation never resumed.

¶11     When asked about the substantial relationship factor (e.g., whether Grace had a substantial relationship with A.P.), Harrington testified she did not think it would be harmful to sever Grace's relationship with A.P. When asked why she had that opinion, Harrington said:

> I have that opinion because over the course of supervising this case and managing [Grace's] case they have not -- they have not, um, been in a role to make good decisions for her, to provide for her educational needs, her protection needs. They struggle to take care of themselves. Um, there has been over the course of the years struggles with criminal charges and incarcerations. They don't ask about [Grace], um, how she's doing, what she likes to eat, what she likes to do, how her health is. They like to see her, but other than that there is not much more as far as [J.L.] and [A.P.] being in a protective parental role over [Grace].

Harrington acknowledged she was aware of "[a] few times" that A.P. had texted Evelyn and said to "tell [Grace] we love her" or would "ask for a picture."

¶12     Harrington also testified that Grace never lived with A.P. during the four years of her life. When asked about whether she was clear with A.P. about the conditions she needed to meet to get Grace back—that she needed to get clean and sober and take parenting classes—Harrington explained A.P. was aware of the

8

required conditions because she went over them with A.P. every time she saw her. At the conclusion of the hearing, the circuit court found it was in Grace's best interests to terminate A.P.'s parental rights.

¶13    A.P. thereafter filed a notice of intent to seek postdisposition relief pursuant to WIS. STAT. § 809.107(2)(bm), and counsel was appointed to represent her on appeal.   In July 2023, A.P. filed a notice of appeal pursuant to § 809.107(5)(a), and in September 2023, A.P. filed a motion pursuant to § 809.107(6)(am) asking this court to remand the case to the circuit court for the purpose of postdispositional factfinding.   This court granted the motion and remanded the case to the circuit court.   In September 2023, A.P. filed a postdisposition motion in the circuit court alleging that her trial attorney provided ineffective assistance by failing to file an affidavit in opposition to the Department's partial summary judgment motion and in failing to advise A.P. of the need to do so.   The postdisposition court held evidentiary hearings at which both A.P. and her trial counsel testified.

¶14    A.P.'s trial counsel explained the timing surrounding the summary judgment motion and detailed how A.P.'s lack of communication limited counsel's options for responding:

- Counsel testified that in October or November, she instructed A.P. to "bring with her everything she had" that could help with her case.  However, when counsel called A.P. for their scheduled phone appointment, A.P. did not answer, and "her phone wasn't accepting service or her voicemail was full."

- Counsel indicated she attempted to have conversations with A.P. on "multiple occasions"—"We had scheduled a visit in November that she did not show to, and my office had continued to try and reach her by phone and did not get an answer at this phone."

9

- "She missed one for sure in November and then from, kind of, that November appointment until early January, I don't have any record of having contact with her. My office, you know, kind of on a weekly basis, was trying to reach her unsuccessfully. And then, like I said, on the fly I think I was able to get ahold of her in January and that's, I think, when I got her email address."

- Counsel explained further that after reaching A.P. "on the fly," her office "scheduled a subsequent call in which [A.P.] did not answer. And then I just know this from reviewing the emails that my office provided to you that there were two other attempts to reach her that were unsuccessful. This was after her missing at least one if not two office visits."

- Counsel did not include additional eWiSACWIS notes to oppose the Department's motion because counsel "did not have an opportunity to communicate with [A.P.] in full on the notes [counsel] had reviewed" and as a result, "did not have her perspective on much of the discovery …."

- Trial counsel confirmed that A.P. disclosed the Christmas 2021 visit with Grace and explained that A.P. "instructed me not to raise that because [A.P.] didn't want to alienate [Evelyn] or throw her under the bus because she knew that [Evelyn] was instructed to not let her see [Grace]."

- On January 12, 2023, A.P. sent trial counsel pictures that A.P. said were from the Christmas 2021 visit, but trial counsel did not include them in her summary judgment response because: (1) A.P. had previously "specifically instructed me not to use them"; and (2) "between January 12th [when A.P. sent the pictures] and January 13th when [counsel] filed the [response to the summary judgment] motion [counsel] did not have an opportunity to communicate with [A.P.]." Counsel also testified that A.P. had been "very firm and adamant" about not disclosing that information. A.P. was aware that her response was due January 13th because she attended the November conference when the circuit court set the summary judgment briefing schedule.

- Trial counsel attached Facebook messenger screen shots (Exhibit 1) A.P. had emailed to her on January 12th.

- When questioned about why counsel did not have A.P. sign an affidavit in opposition of the Department's motion, counsel said: "I didn't have her available and able to sign an affidavit" and explained that she "hadn't been able to communicate in full with A.P. as to some of the issues that [she] was attempting to outline within [the] motion and response" and that what she submitted was "the best that [she] could do given the lack of communication."

- Regarding the merits of the motion, counsel testified that she thought that Harrington's visitation suspension letter provided good cause for A.P.'s failure to have contact with Grace. Trial counsel said that the circuit court considered A.P.'s position, despite not having an affidavit to support it: "our position was heard[,]" and she felt the argument she made was not "disregarded due to the lac[k] of affidavit[.]"

- Counsel agreed that an affidavit from A.P. may have helped, but A.P. simply was not available to make that happen.

- Counsel acknowledged that the eWiSACWIS notes demonstrated A.P. had contact with Evelyn and Harrington but explained that this contact was not what was "specifically required by the social worker."

¶15    During her testimony, A.P. confirmed that she informed trial counsel about the Christmas 2021 visit with Grace, that she provided pictures from that visit to trial counsel on January 12, 2023 (the day before A.P.'s response to the summary judgment motion was due), and that she specifically told trial counsel *not* to include that information or use those photographs, even though trial counsel had informed her that doing so would be helpful. She also confirmed that she provided the Facebook messages between herself and Evelyn that were submitted in support of her summary judgment response to counsel the same day she provided the photographs.

¶16    When asked, A.P. confirmed that she believed she had good cause for not visiting or communicating with Grace during the alleged abandonment

period. In response to appellate counsel's questions, A.P. indicated she believed she had good cause based on Harrington's suspension letter and because she was experiencing personal struggles, housing instability, and financial struggles at the time. A.P. also indicated that she did not feel sufficiently supported during that time period. She additionally confirmed that her driver's license was suspended at the time, but she later admitted that she had at times driven while her license was suspended.

¶17 In regard to her belief that she had good cause stemming from Harrington's suspension letter, A.P. indicated that she attempted to set up a meeting with Harrington, but because Harrington could not guarantee she would see Grace directly after the meeting, she ultimately chose not to meet with Harrington, even though she knew she could not see Grace until she did so. A.P. additionally confirmed that Harrington had not given her "a specific list of things [she] would have to do after meeting with [Harrington] to resume visits with [Grace]" and that the need to complete additional requirements was just "[a] belief that [she] had." A.P. also admitted to "hanging up" on Harrington during one of their phone calls.

¶18 When appellate counsel asked A.P if she would "have signed an affidavit" as to these issues had trial counsel told her "at any point that [she] needed to sign an affidavit otherwise the judge would find grounds to terminate [her] parental rights[,]" A.P. confirmed that she would have done so. It is not clear from the Record, however, that A.P. ever provided trial counsel with such information.

¶19 After hearing arguments, the postdisposition court denied A.P.'s motion. It explained that "the question that needs to be answered is whether or not

12

counsel's conduct"—failing to file an affidavit opposing the Department's summary judgment motion—"so undermined proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result" and properly identified the two-prong test courts apply to ineffective assistance of counsel claims. After noting that A.P. carried "the burden to show that her counsel's representation was deficient and fell below the objective standard of reasonableness[,]" the court stated:

> [A.P.'s trial counsel] testified that she was aware of the requirements of Wisconsin Statute 802.08 to file an affidavit in response to the summary judgment motion. She testified that she did not inform her client of the requirement, and she further explained that her client had not maintained contact with her after the November 9th, 2022, hearing where the Court set the briefing schedule for the summary judgment motion and response.

> [A.P.] missed an in-person meeting sometime in November '22, after that court date where the schedule was provided, without calling prior to that meeting to cancel and that she also did not respond to phone calls and correspondence from [trial counsel's] office until January of 2023, immediately before the response was due.

> [Trial counsel] did not warn [A.P.] that the affidavit was required, and she did not request a continuance in order to attempt to have more time to establish contact with her client. She drafted a response with minimal involvement and cooperation from [A.P.]. Eventually, she was contacted or did -- was able to be in contact with [A.P.] and received photos from a visit that allegedly occurred in December of 2021 and was told not to include those photos in any submissions to the Court. So [trial counsel] did not include the photos as trial strategy; that was at the request of [A.P.]. The statement on the record was that that strategy was in hopes of preserving a relationship with the children's care provider.

> [Trial counsel] advised [A.P.] that using the photos would be helpful to her, but [A.P.] directed her not to do so; and that was based on [A.P.'s] own testimony.

> [Trial counsel] drafted a response to the summary judgment motion and included notes from the social

worker, in an attempt to dispute the abandonment allegations. She was afforded an opportunity to argue these positions and indicate that there was an actual material issue of fact and dispute at the summary judgment hearing.

In order for [A.P.] to prevail with ineffective assistance of counsel claim, she must show that her counsel's actions caused prejudice to her as to deprive her the ability to receive a fair trial with a reliable result. And she's alleging that had the affidavit been filed that the summary judgment motion would not have been granted.

From the record of February 10th, 2023, for the summary judgment hearing, it's clear that Judge Hoffmann considered [A.P.'s] arguments and made a decision that -- and specifically her arguments that there was good cause for her to not visit her child, which are the arguments that she indicates should have been included in an affidavit, it's clear that the Court considered those arguments even without the affidavit.

[Trial counsel] argued that [A.P.] believed she could not visit due to the social worker having put the visits on hold. Judge Hoffmann found that that argument was not credible and did not demonstrate a material issue of fact and dispute as the visits were put on hold until [A.P.] met with the social worker, not put on hold indefinitely.

[A.P.] indicated that she did not attempt to visit with the social worker after being told that the meeting would be necessary in order to restart visits. Judge Hoffmann also found that her argument that visits would not have been meaningful due to the child's age should not be credible, as the child was approximately 3 years old during the time period.

The fact that the affidavit was not filed did not prevent the Court from ruling on the arguments that [A.P.] indicated should have been included in the affidavit. And so today this Court cannot find that there's a reasonable probability that if [trial counsel] would have filed an affidavit in opposition to the summary judgment motion that the results of the proceedings would have been any different.

Based on all the circumstances, the omission of the filing of the affidavit was not outside the range of professionally competent assistance. I cannot find that counsel's representation fell below the objective standard

of reasonableness. And so at this point, the motion is denied.

¶20    A.P. appeals.

## II. DISCUSSION

¶21    Review in this case is limited to whether A.P.'s trial counsel provided ineffective assistance during the grounds phase. To prevail on an ineffective assistance of counsel claim, A.P. must show both that counsel's performance was deficient and that the deficient performance was prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, A.P. must show that her attorney made errors so serious that she "was not functioning as the 'counsel' guaranteed … by the Sixth Amendment." *See id.*; *see also State v. Savage*, 2020 WI 93, ¶28, 395 Wis. 2d 1, 951 N.W.2d 838. This court presumes that counsel's conduct fell "'within the wide range of reasonable professional assistance'" and will grant relief only upon a showing that counsel's performance was objectively unreasonable under the circumstances. *See Savage*, 395 Wis. 2d 1, ¶28. To establish prejudice, A.P. must "show[] that counsel's errors were so serious as to deprive [her] of a fair trial, a trial whose result is reliable." *See Strickland*, 466 U.S. at 687. In other words, to establish prejudice, A.P. "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *Savage*, 395 Wis. 2d 1, ¶32.

¶22    This court reviews an ineffective assistance of counsel claim using a mixed standard of review. *Savage*, 395 Wis. 2d 1, ¶25. This court will not overturn the circuit court's factual findings, including those regarding "'trial

counsel's conduct and strategy, … unless clearly erroneous[.]'" *Id.* Whether counsel's conduct constitutes constitutionally ineffective assistance is a question of law this court reviews de novo. *Id.* A.P. must satisfy both prongs—deficiency and prejudice—to establish ineffective assistance. *See Strickland*, 466 U.S. at 687; *State v. Carter*, 2010 WI 40, ¶21, 324 Wis. 2d 640, 782 N.W.2d 695. It is unnecessary "to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

¶23 Having reviewed the Record, this court is not persuaded that A.P.'s trial counsel, in failing to submit an affidavit in opposition to the Department's summary judgment motion, made an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" given the circumstances of this case. *See Strickland*, 466 U.S. at 687. This is so largely because A.P. herself hindered her trial counsel's ability to act on her behalf in regard to responding to the summary judgment motion because she failed to attend meetings and failed to remain in contact with her attorney until the day prior to her deadline to respond. It was also A.P. who failed to provide trial counsel with relevant information regarding the alleged communication with Grace that was alluded to in her summary judgment response brief.

¶24 The postdisposition court made multiple findings—all of which the Record supports—regarding A.P.'s above-referenced actions and inactions that hindered trial counsel's ability to more fully respond to the summary judgment motion and to submit an affidavit: (1) trial counsel made repeated attempts to communicate with A.P. to prepare the summary judgment response; (2) A.P. knew the date the response was due and yet did not answer counsel's phone calls; (3) A.P. failed to show up for scheduled meetings and did not make attempts to return the missed calls; and (4) only at the last minute did A.P. provide counsel

16

with any information at all relative to the summary judgment filing. The circuit court also found that A.P. forbid counsel from using some of the material—such as the Christmas 2021 photographs—that she provided to her counsel at the eleventh hour.[12] Trial counsel therefore cannot reasonably have been expected to submit an affidavit regarding the Christmas 2021 photographs under such circumstances.

¶25 Similarly, despite A.P.'s confirmation at the postdisposition hearing that she would have "signed an affidavit on the topics that [appellate counsel] asked [her] about" during the hearing—such as her assertion that she *had* talked to Grace on the phone while visitation was suspended,[13] her personal and financial struggles, suspended driver's license, and purported lack of support—it does not appear from the Record that A.P. shared such information with trial counsel. Just as it would have been unreasonable for trial counsel to submit an affidavit regarding the Christmas 2021 visit over A.P.'s objection, it is likewise

---

[12] On appeal, A.P. seems to imply that trial counsel nevertheless should have submitted information, including an affidavit from A.P., regarding the Christmas 2021 visit, even though A.P. specifically told counsel *not* to use that information. To the extent appellate counsel suggests that trial counsel should have ignored A.P.'s wishes and submitted that information over her objection because "the objective … was to defeat … summary judgment," this court rejects counsel's suggestion—particularly in light of the clear testimony that A.P. did not want to submit this information *despite* trial counsel having informed her that doing so would be helpful. Moreover, this court notes that even though the purported Christmas 2021 visit fell within the *Department*'s asserted abandonment timeframe, the visit occurred more than three months after the start of the abandonment period, which is the length of time that WIS. STAT. § 48.415(1)(a)2 requires.

[13] Although A.P. testified that she had talked to Grace while visitation was suspended (although without specificity as to when), she argued during the summary judgment stage that Grace "was of an age that contact via phone would have been meaningless[,]" thus suggesting that she actually had *not* spoken with Grace. In any event, this contradiction further suggests that A.P. failed to apprise trial counsel of information that may have been relevant to her good cause argument.

unreasonable to have expected trial counsel to submit an affidavit regarding topics that may have supported A.P.'s good cause argument when A.P. does not appear to have shared such information with trial counsel in the first place.

¶26 In summary, trial counsel's failure to submit an affidavit in support of A.P.'s good cause argument was not unreasonable under the circumstances because it was *A.P.* who failed to communicate when her trial counsel attempted to reach her, it was *A.P.* who did not provide trial counsel with the type of information she testified about at the postdisposition hearing, and it was *A.P.* who decided that the Christmas 2021 photographs that she now argues should have been submitted could not be used in response to the summary judgment motion. Because these were *her* decisions, A.P. cannot now, after the fact, fault her trial counsel for her own choices simply because she is dissatisfied with the result. Moreover, while WIS. STAT. § 802.08(3) may have required that A.P. submit an affidavit in response, mere submission of an affidavit in opposition to the Department's summary judgment motion, standing alone, is insufficient to defeat such a motion; rather, the affidavit must create a genuine issue of material fact. A.P. has not established that she provided trial counsel with information to include (or in regard to the photographs, permission to use) in an affidavit that would have created a genuine issue of material fact. Consequently, A.P. has failed to demonstrate that trial counsel performed deficiently under these circumstances, and she therefore cannot demonstrate that trial counsel provided ineffective assistance.

¶27 Because A.P. has not established that trial counsel performed deficiently, it is unnecessary for this court to address whether counsel's performance was prejudicial. *See Strickland*, 466 U.S. at 697 (it is unnecessary "to address both components of the inquiry if the defendant makes an insufficient

showing on one"). Nevertheless, even assuming trial counsel's performance was deficient, this court concludes that trial counsel's failure to file an affidavit was not prejudicial. As the postdisposition court explained in detail as set forth above, the circuit court fully considered A.P.'s argument as to good cause at the grounds stage despite A.P. not having filed an affidavit. And, to the extent the Christmas 2021 photographs may have created an issue of material fact that would have defeated the grant of summary judgment, A.P. deliberately chose not to submit those photographs for the summary judgment court's consideration. Trial counsel's compliance with A.P.'s specific instruction regarding those photographs cannot constitute ineffective assistance after the fact. Moreover, A.P., having chosen that position in the circuit court, cannot expect to succeed on appeal by asserting that the photographs, in hindsight, should have been submitted. "[U]nder the doctrine of invited error, '[an appellant] cannot create [her] own error by deliberate choice of strategy and then ask to receive benefit from that error on appeal.'" ***State v. Slater***, 2021 WI App 88, ¶40, 400 Wis. 2d 93, 968 N.W.2d 740 (citation omitted).

  *By the Court.*—Order affirmed.

  This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.