COURT OF APPEALS
DECISION
DATED AND FILED

November 25, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1877-CR**

Cir. Ct. No. **2020CF62**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

REX A. BIGGER,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Buffalo County: RIAN W. RADTKE, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Rex A. Bigger appeals a judgment convicting him, following a jury trial, of repeated sexual assault of the same child. He also appeals

an order denying his motion for postconviction relief. Bigger argues that his trial counsel was constitutionally ineffective on the following three grounds: (1) counsel's cross-examination of a witness elicited a response that constituted inadmissible other-acts evidence; (2) counsel failed to object to the investigating detective's repeated responses that he believed the victim, which allegedly violated *State v. Haseltine*, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984); and (3) counsel failed to consult with or hire an expert to support Bigger's defense based on his having made a false confession. We reject Bigger's arguments and affirm.

## BACKGROUND

¶2 In May 2020, the State charged Bigger with repeatedly sexually assaulting Brittany[1] between January 2011 and October 2013. According to the criminal complaint, Brittany met with Detective Michael Osmond and described multiple instances of Bigger sexually assaulting her at a residence on East Hudson Street in Mondovi, Wisconsin. Osmond also met with Bigger, and that interview was audio-visually recorded. After about one and one-half hours, Bigger admitted that he and Brittany "had sex" and that he was "positive it was no more than five times." The matter proceeded to a jury trial.

¶3 At trial, Brittany testified that her mother and Bigger divorced when she was very young and that Bigger later married JoAnn Werlein. Brittany recalled that she was about ten or eleven years old when Bigger moved into the Hudson Street residence in 2011 and that she and her sister visited Bigger at that

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we use a pseudonym when referring to the victim in this case.

residence on the weekends. Brittany testified that she, her sister, and Werlein slept in the living room when they visited Bigger, while Bigger slept in his bedroom upstairs.

¶4 Brittany further testified that Bigger began to sexually assault her when he lived at the Hudson Street residence. She stated that after she fell asleep in the living room, Bigger would carry her up to his bedroom. Brittany further testified that Bigger would make her wear a nightgown and would tell her to not wear her underwear. Brittany continued that she would get on the bed, and Bigger would sexually assault her. Brittany then described in detail how Bigger would sexually assault her. She also described instances of Bigger sexually assaulting her in the restroom and one instance that occurred in the living room.

¶5 Brittany stated that the sexual assaults stopped in 2013 when Bigger and Werlein separated and both moved out of the residence. Brittany testified that after the assaults stopped, she told her sister about them, and her sister then told their mother. Brittany recalled that after telling her sister about the assaults, she went to a center where she did a forensic interview, but nothing else happened at that time. On cross-examination, Brittany agreed that there were things she did not mention in the 2013 forensic interview that she mentioned in her trial testimony.

¶6 Werlein testified that she and Bigger were married from 2003 to 2016 but separated in 2012. Werlein also testified that she and Bigger moved into the Hudson Street residence in 2011 and that Brittany and her sister would visit on the weekends. She further testified that when she lived at the residence, Bigger slept upstairs while she slept on the couch. When Brittany and her sister visited, Werlein stated that they would sleep on the couch with her. Werlein also stated

that when they fell asleep, Bigger "would carry only [Brittany] upstairs to the bed."

¶7 Werlein described one specific night when she went upstairs to use the restroom and saw Brittany lying on Bigger's bed with her nightgown pulled up past her chest. Werlein recalled that Brittany did not have her "undies on, she had no bottoms on, and I went in and I thought it was strange so I pulled down her nightgown and then covered her up." On cross-examination, Werlein testified that the circumstances of her relationship with Bigger in 2011 and 2012 "were not good" and that their relationship "was coming to an end."

¶8 Detective Osmond testified about his meetings with Brittany and Bigger. Osmond testified that during his interview with Bigger, he asked Bigger whether he had sex with Brittany, and Bigger "denied it, approximately seven times, there were 18 times that he stated he didn't remember, and then there was a number of times that he said that he had sex with [Brittany]." Elaborating on the number of times Bigger admitted he had sex with Brittany, Osmond testified that Bigger first "stated that he woke up and [Brittany] was on top of him having sex with him. He stated that that occurred two to three more times; again I asked for more of a definitive number, he then said well, it didn't happen more than five times."

¶9 Osmond also testified that he asked Bigger whether he wanted to write an apology letter and that Bigger wrote one. The apology letter, addressed to Brittany, stated the following:

> I would like you to know how sorry I am for what I done [sic] to you. During some of your childhood. I hope your [sic] will be able to forgive me. I will seek more counciling [sic] if you want that. I will do what I have to to

> make this better, and to try to right the wrongs I have done.
> I am truly very sorry with all my heart.

The jury then watched portions of Bigger's recorded interview.

¶10     On cross-examination, Osmond testified that Bigger denied sexually assaulting Brittany several times in a portion of the interview that the jury did not watch. Defense counsel also asked several questions about statements Osmond made in response to Bigger's denials, indicating Osmond's belief that Bigger had sexually assaulted Brittany.

¶11     The jury found Bigger guilty of repeated sexual assault of a child. The circuit court subsequently imposed a 55-year prison sentence, consisting of 35 years of initial confinement followed by 20 years of extended supervision.

¶12     Bigger moved for postconviction relief, seeking a new trial on the ground of ineffective assistance of trial counsel. Bigger argued that his counsel was ineffective by cross-examining Werlein in a way that elicited a response containing inadmissible other-acts evidence, by failing to object to Osmond's repeated responses that vouched for Brittany's credibility and that expressed his opinion that Bigger was guilty, and by failing to consult or hire an expert witness on false confessions to support Bigger's defense. The circuit court held a *Machner*[2] hearing, at which Bigger's trial counsel and his expert witness testified.

¶13     The circuit court denied Bigger's motion for postconviction relief, concluding that, even if there were errors by his counsel, Bigger's defense was not

---

[2]  *See* ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

prejudiced by those errors, given the overwhelming and compelling evidence of guilt. Bigger appeals. Additional facts will be provided below as necessary.

## DISCUSSION

¶14 On appeal, Bigger renews his ineffective assistance of counsel claims, raising the same arguments he made in his postconviction motion. An ineffective assistance of counsel claim presents a mixed question of fact and law. *State v. Carter*, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695. We uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* Whether trial counsel's assistance was ineffective is a question of law that we review de novo. *Id.*

¶15 An ineffective assistance of counsel claim requires a defendant to show both that his or her counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.*, ¶21. We need not address both deficient performance and prejudice if the defendant fails to make a sufficient showing on one of those elements. *State v. Pico*, 2018 WI 66, ¶20, 382 Wis. 2d 273, 914 N.W.2d 95. Counsel's performance is deficient when his or her representation falls below an objective standard of reasonableness considering all the circumstances. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). We strongly presume that counsel's conduct "falls within the wide range of reasonable professional assistance." *Id.* at 689.

¶16 Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* The defendant "need not prove the outcome would 'more likely than not' be different

in order to establish prejudice." ***State v. Sholar***, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). Rather, the defendant must show that "but for his lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt." ***Id.***, ¶45. "If there is no reasonable probability that the jury would have reached a different verdict," the defendant has not shown prejudice. ***Id.***, ¶46.

## I. Werlein's Cross-examination

¶17    Bigger first argues that his trial counsel was ineffective by eliciting an inadmissible response from Werlein regarding her relationship with Bigger. As noted above, Werlein testified on cross-examination that her relationship with Bigger in 2011 and 2012 was "not good" and that it "was coming to an end." Counsel then continued questioning Werlein about her relationship with Bigger, asking, "[I]s it fair to say it was basically over by the time you moved out of that apartment?" Werlein answered, "Technically, yes, but there were some other issues that—with him and I." The following exchange then occurred:

> Q    Fair enough. My point, I guess, is at the time that you were living at that apartment, there were—the circumstances of the relationship were not good, right?
>
> A    No, he was abusive.

¶18    Bigger's counsel then requested a sidebar. Afterward, counsel asked, "You understand that we're not here today to have a trial about whether or not Mr. Bigger was abusive to you, right?" Werlein replied, "Correct, correct." Counsel, however, continued, asking, "You understand that this isn't your opportunity to level accusations against Mr. Bigger, correct?" At this point, the

State objected, arguing that counsel was "bullying the witness," and the circuit court sustained the objection.

¶19 Following Werlein's testimony, Bigger's counsel requested that the sidebar be placed on the record, which the circuit court did. Counsel argued that Werlein's testimony that Bigger was abusive was not responsive to his question, that his question did not "open the door to having her say that," and that Werlein had "a desire to present information to the jury in this context that's detrimental to Mr. Bigger." For these reasons, counsel argued that Werlein's statement that Bigger was abusive was irrelevant and requested that the jury be instructed to disregard Werlein's response.

¶20 The circuit court agreed, concluding that the response was irrelevant and that the response could confuse the jury as to what the issues were. The court subsequently informed the jury that it was striking Werlein's response that Bigger was abusive, stating that it was "irrelevant and I ask that you carve that out of your mind as that is not relevant—that's not the issue in this matter, and so I'm going to ask that you—that you disregard the struck testimony." The court again repeated its instruction to the jury after closing arguments, stating: "During the trial, the Court has ordered certain testimony to be stricken. Disregard all stricken testimony."

¶21 Bigger argues that there was "no conceivable strategic benefit" for his counsel to continue questioning Werlein about the circumstances of her relationship with Bigger after she answered that her relationship with him was "not good" and that it "was coming to an end." By continuing to question Werlein about the relationship, Bigger contends that his counsel elicited an inadmissible response that prejudiced Bigger because it allowed the jury "to draw the inference

that Mr. Bigger abused women with whom he was in a domestic relationship." Bigger further contends that the circuit court's instruction to the jury did not mitigate the prejudice caused by Werlein's response because the court's instruction to the jury "was not a directive" to the jury but, instead, was "phrased as a request." He thus asserts that the "clear meaning of the court's statement" gave the jury "the option of considering the inadmissible testimony."

¶22 We conclude that Bigger's defense was not prejudiced by his counsel eliciting Werlein's response that Bigger was abusive, given the circuit court's curative instruction and the overwhelming evidence of guilt. As an initial matter, Bigger's counsel did not elaborate on Werlein's statement about abuse after the sidebar. Instead, counsel asked Werlein twice whether she understood the trial was not related to her accusations, and the State then made an objection, which the circuit court sustained. Furthermore, Bigger does not point to any instance during the trial in which the State mentioned or focused on Werlein's responses in this line of questioning.

¶23 More importantly, we disagree that the circuit court's instruction striking Werlein's response as being irrelevant was "phrased as a request." There was nothing permissive about the court's instruction, given that it was quite clear that the court was striking Werlein's response as being irrelevant to the trial and that the jurors had to disregard the stricken testimony. The court again repeated the instruction at the end of the trial: "Disregard all stricken testimony." Thus, the court clearly instructed the jury twice to disregard Werlein's response, and jurors are presumed to have followed those instructions. *See State v. LaCount*, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780.

¶24    In addition, we agree with the circuit court that Bigger's defense was not prejudiced by this alleged deficiency given the overwhelming and compelling evidence in this case, which we discuss more below. *See infra* ¶¶41-45. Therefore, in light of the court's curative instruction both at the time it struck the testimony and at the end of the trial, and in light of the overwhelming evidence of guilt in this case, Bigger fails to show there was a reasonable probability the jury would have had a reasonable doubt as to his guilt but for Werlein's statement that Bigger was abusive.

## II.  Detective Osmond's Testimony

¶25    Bigger next argues that his trial counsel was ineffective by not objecting to Osmond's unresponsive answers regarding statements that he made to Bigger in response to Bigger denying that he sexually assaulted Brittany.  In particular, Bigger contends that his counsel caused Osmond to repeatedly tell the jury his belief that Bigger committed the charged crime.  Bigger argues this testimony violated ***Haseltine*** because it amounted to Osmond vouching for Brittany's credibility regarding the allegations of sexual assault.

¶26    During Osmond's cross-examination, Bigger's counsel asked whether Osmond "made statements to [Bigger] indicating that your view was that you knew that he had done it[.]"  Osmond answered, "I made indications to [Bigger] that I believed the witness and that I felt she was telling the truth and that I believed that he had sexually assaulted [Brittany]."

¶27    Counsel asked similar questions regarding Osmond's statements to Bigger during the interview that Osmond believed Bigger had sexually assaulted Brittany.  For example, counsel asked whether Osmond "indicated to [Bigger] that [he] 110 percent believed that [Bigger] did it[.]"  Osmond responded, "Yes.

During the interview, I believe[d] that he had sexually assaulted [Brittany], that's accurate." When counsel asked whether Osmond had stated, "You can tell me until you're blue in the face but I know what happened," Osmond answered that "during the entire time of the interview I felt that Mr. Bigger had sexually assaulted [Brittany] and so it's very possible that I would have said that."

¶28 When Bigger's counsel asked Osmond to "confirm that you're not denying that you said those things but you just don't remember the exact verbiage that I presented to you," Osmond answered that

> throughout the process I felt that Mr. Bigger had sexually assaulted [Brittany] and so I certainly may have made comments that I didn't believe him and didn't feel he was telling me the accurate information.… [A]ll I can confirm is that during the entire interview I felt that Mr. Bigger had sexually assaulted [Brittany] prior to him telling me that he sexually assaulted [her].

¶29 Similarly, when Bigger's counsel asked Osmond if he agreed that he told Bigger several times "something to the effect of 'this was not about the what of what occurred but the why,'" Osmond responded: "I 100 percent believed that he had sexually assaulted [Brittany] and during our conversation I was requesting the reasoning why, not if he had or hadn't done it." And again, when counsel asked whether it was fair to say that at the end of the interview Osmond was under the impression that Bigger's statements "were an admission to sexually assaulting or touching [Brittany]," Osmond responded: "I asked him how many times he had sex with [Brittany] and he told me no more than five; so yes, I believe that he had sexually assaulted [Brittany] based on his answer of 'I had sex with [Brittany].'" Finally, Bigger's counsel asked whether Osmond agreed that he told Bigger that he "wholeheartedly 110 percent believe that it did happen." Osmond responded, "Yes, I 110 percent wholeheartedly agree that it did happen."

¶30     Bigger points to other similar responses by Osmond and argues that his counsel never objected to Osmond's responses and that counsel failed to provide "a coherent strategy that would explain why he did not object." At the *Machner* hearing, Bigger's counsel testified that he wanted to point out that Osmond made statements to Bigger indicating that Osmond did not believe him. Counsel further testified that he framed his questions to have Osmond "agree that he utilized certain techniques that were designed to elicit the answer that he was after" and that counsel's questions were focused on what Osmond "actually said to Mr. Bigger during the interview." Counsel agreed, however, that Osmond's answers to several questions regarding Bigger's interview were nonresponsive, that he did not object to those answers as being nonresponsive, and that he knew those answers provided an opinion about Bigger's guilt or innocence.

¶31     Bigger's counsel also testified that his overall strategy when questioning Osmond was to show the jury that Osmond did not have any information going into the interview with Bigger "other than the fact that [Brittany] had said it happened." Counsel stated that the evidence presented at trial showed Osmond did not have "the requisite information"—other than what Brittany had told him—to believe that Bigger had sexually assaulted Brittany. Counsel thus sought to argue to the jury that Osmond went into the interview without truly believing that Bigger had sexually assaulted Brittany but, rather, with the objective of getting Bigger to admit that he had.

¶32     We agree with the State that Bigger's counsel was not deficient by failing to object to Osmond's repeated responses because, as the State argues, those responses did not violate *Haseltine*. Pursuant to *Haseltine*, a witness is not "permitted to give an opinion that another mentally and physically competent witness is telling the truth." *Haseltine*, 120 Wis. 2d at 96. This rule "is intended

12

to prevent witnesses from interfering with the jury's role as the 'lie detector in the courtroom.'" *State v. Snider*, 2003 WI App 172, ¶27, 266 Wis. 2d 830, 668 N.W.2d 784 (citation omitted). Thus, an opinion "that a complainant was sexually assaulted or is telling the truth is impermissible." *State v. Krueger*, 2008 WI App 162, ¶9, 314 Wis. 2d 605, 762 N.W.2d 114.

¶33 When neither the testimony's purpose nor its effect is to attest to a witness's truthfulness, the *Haseltine* rule is not violated. *See State v. Smith*, 170 Wis. 2d 701, 718, 490 N.W.2d 40 (Ct. App. 1992). For example, in *Smith*, we concluded that a detective's testimony did not violate the *Haseltine* rule when he testified that an accomplice initially denied involvement in a crime, but he later changed his story to what the detective "felt was the truth." *Smith*, 170 Wis. 2d at 706, 718. We explained that the detective was describing the circumstances of the accomplice's interrogation and the reasons for it. *Id.* at 718. Because the detective did not believe the accomplice's initial story, he continued the interrogation "until he got what he believed to be the truth." *Id.* Thus, we held that the detective's testimony that the accomplice later changed his story to what the detective "felt was the truth" was not an attempt to bolster the accomplice's credibility but was simply an explanation of events during the interrogation. *Id.*

¶34 We similarly concluded in *Snider* that a detective's repeated responses to defense counsel's cross-examination that the detective believed the victim's statement—and that he did not believe the defendant's version of events—did not violate the *Haseltine* rule. *Snider*, 266 Wis. 2d 830, ¶¶25, 27. We explained that the detective "testified to what he believed at the time he was conducting the investigation, not whether [the defendant] or the victim was telling the truth at trial." *Id.*, ¶27. We therefore held that the detective's responses to counsel's cross-examination did not violate the *Haseltine* rule because they simply

13

recounted how the detective "conducted the interrogation and his thought processes at that time." *Snider*, 266 Wis. 2d 830, ¶27.

¶35 In the same way, Osmond's repeated responses to Bigger's counsel's questions did not violate the *Haseltine* rule. Osmond simply testified to what he believed at the time he was interviewing Bigger, not to what he believed at trial. Just like the detective's responses in *Snider*, Osmond's responses here recounted how he conducted Bigger's interview—i.e., by telling Bigger he did not believe him—and his thought process throughout that interview—i.e., that during the interview, he believed Bigger had sexually assaulted Brittany. At no point did counsel ever ask Osmond whether he believed Brittany's *trial* testimony. Nor did Osmond ever state that he believed Brittany's trial testimony. Thus, Osmond's repeated responses had neither the purpose nor the effect of attesting to Brittany's truthfulness at trial. Consequently, Osmond's testimony did not violate the *Haseltine* rule, and Bigger's counsel was not deficient for failing to object to the testimony.

## III. Expert Witness Regarding False Confessions

¶36 Finally, Bigger argues that his trial counsel was ineffective because counsel "did not retain an expert to assist in explaining the phenomenon of false confessions" in order to "counter the State's case." At the *Machner* hearing, Bigger's counsel testified that he sought to show that Bigger's confession to Osmond was unreliable. But counsel also stated that he did not consult an expert because he believed that an expert, "at best, under these circumstances would be able to describe the circumstances under which a person might give a false confession or might … be pressured into giving unreliable statements, but not be able to say that the statements that were given in this case were false." Counsel

also had concerns "about drawing a massive amount of attention to the confession and making the trial about whether or not it was false."

¶37 At the *Machner* hearing, Bigger also presented testimony from Dr. Brian Cutler. Cutler testified that he does not opine on whether a confession is true or false, but instead he evaluates interrogations "for levels of coerciveness and for risk factors to coerce a false confession." Cutler stated that he had reviewed Bigger's recorded interview and the police reports and had concluded that the interview was "highly coercive" and "intense." Cutler further concluded that Osmond used several tactics to attempt to convince Bigger "that he had no chance of establishing his innocence" and to convince Bigger that "confession is his best option."

¶38 Although the circuit court found that an expert would have supported Bigger's argument that he falsely confessed, the court concluded that testimony similar to Cutler's would not have had a high impact on the trial's result because "there was compelling and overwhelming evidence otherwise of guilt." In particular, the court explained that "there's a highly credible victim testifying, there's no motive to lie that was shown," and "[t]here was really no evidence for the jury to think or to reach a conclusion otherwise other than … what was presented at trial."

¶39 Bigger argues that testimony like Cutler's "would have undercut and countered the State's argument that Mr. Bigger confessed to the crime charged" because it "would have provided an answer to the jury's most obvious question in this case: Why would someone falsely confess to a crime they didn't commit?" Because his counsel failed to answer this question through expert testimony, Bigger contends that the State could argue, without contradiction, that Bigger

"confessed to sexually assaulting [Brittany], and that this confession was true." Had counsel provided an explanation for Bigger's alleged false confession, Bigger asserts there was a reasonable probability that the trial's result would have been different.

¶40    We agree with the circuit court that even if Bigger's counsel had called an expert to provide testimony similar to Cutler's, there was not a reasonable probability that the jury would have had a reasonable doubt as to guilt, given the overwhelming and compelling evidence to the contrary in this case.

¶41    First, Brittany described in explicit detail how Bigger sexually assaulted her. She testified that Bigger would "penetrate my vagina, and I would have to touch his penis, scratch his penis"; that Bigger would spit on her or on himself if "he ever felt that [Brittany] was not wet enough" and "would rub his penis through the lips of [Brittany's] vagina"; that if she did not want to do anything, Bigger would grab Brittany's hand "and put it on his penis and make [her] caress his penis." Brittany stated that Bigger sexually assaulted her in these ways at least 50 times.

¶42    Brittany further testified that often when Bigger used the restroom, he would call her into the restroom, take off her pants or lift up her nightgown, "and rub his penis through the lips of [her] vagina." Brittany also recalled an instance in the living room where she "was bent over on the couch and it was very painful." Brittany also testified that after sexually assaulting her, Bigger would let

her watch her favorite movie, and he would also tell her that he loved her and that "it was okay what he was doing to [her]."[3]

¶43     Second, Werlein corroborated Brittany's testimony regarding the Hudson Street residence, including where everyone would sleep and who Bigger would carry upstairs. She also recounted the one night she saw Brittany on Bigger's bed with her nightgown pulled up past her chest and "no bottoms on." This description was consistent with Brittany's testimony that she would wear a nightgown when Bigger sexually assaulted her and that she would not wear any underwear.

¶44     Finally, and importantly, the State points to Bigger's letter of apology to Brittany, which he wrote during his interview with Detective Osmond. Bigger argues that the letter "does not specify that for which he is apologizing," that the letter was "apologizing for unspecified transgressions and failures in parenting," and that the State fails to make the connection between the apology letter and Brittany's allegations. Although Bigger's apology letter did not specifically mention the sexual assaults Brittany described, it did state that Bigger was sorry for what he had done to Brittany during "some of [her] childhood," that he would seek counseling for those acts, and that he wanted to "right the wrongs I have done." Here, Brittany testified about events that occurred during her childhood—specifically, when she was ten or eleven years old. Her testimony

---

[3] Bigger contends that Brittany's testimony had "some glaring inconsistencies," given that specific details to which she testified were not mentioned in her 2013 forensic interview. However, an earlier omission of details is not the same as making an actual prior inconsistent statement.

detailed Bigger's sexual assaults and made no mention of anything regarding how he treated her as a parent or some other occurrence.

¶45     Furthermore, Bigger wrote the apology letter during an interview with Osmond, and the interview specifically involved Brittany's sexual assault allegations. Bigger also confessed to these sexual assault allegations during the interview. Osmond was not investigating any parenting or other complaints from Brittany. Bigger does not explain why Osmond would ask Bigger, and Bigger would agree, to write an apology letter for something other than the sexual assaults discussed during the interview. Thus, even if the letter did not apologize for specific acts of sexual assault, the jury could reasonably infer that the letter referred to the sexual assaults that occurred during Brittany's childhood and to which Bigger admitted.

¶46     Given all of the foregoing evidence, we conclude that Bigger has not shown there is a reasonable probability that the jury would have had a reasonable doubt as to guilt had his trial counsel consulted or hired an expert on false confessions.[4]

*By the Court.*—Judgment and order affirmed.

---

[4] Bigger additionally argues that his trial counsel's "instances of deficient performance," taken together, are "sufficiently prejudicial to call into question the result of the trial." Although "we may aggregate the effects of multiple incidents of deficient performance" when determining prejudice, "in most cases errors, even unreasonable errors, will not have a cumulative impact sufficient to undermine confidence in the outcome of the trial, especially if the evidence against the defendant remains compelling." *State v. Thiel*, 2003 WI 111, ¶¶60-61, 264 Wis. 2d 571, 665 N.W.2d 305. Whether counsel's aggregate errors are enough to meet the prejudice element of an ineffective assistance of counsel claim depends on the totality of the circumstances at trial. *Id.*, ¶62. Given the overwhelming and compelling evidence of Bigger's guilt that we have just outlined, Bigger fails to establish that absent his trial counsel's alleged multiple errors, there was a reasonable probability the jury would have had a reasonable doubt as to Bigger's guilt.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2023-24).